RENT-A-CAR COMPANY *v.* GLOBE & RUTGERS FIRE INSURANCE COMPANY.

[No. 7, October Term, 1931.]

250

*Decided October 30th, 1931.*

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, PARKE, and SLOAN, JJ.

*Richard E. Preece* and *Leon H. A. Pierson,* with whom was *Edward Pierson* on the brief, for the appellant.

*Leonard Weinberg* and *Harry J. Green,* with whom were *Weinberg & Sweeten* on the brief, for the appellee.

252

OFFUTT, J., delivered the opinion of the Court.

The appellant in this case is a corporation which, from April 3rd, 1926, until this suit, was engaged in the business of renting automobiles. Its principal office was at 701 East Baltimore Street, but it maintained branches respectively at 1241 Light Street and in the 3700 block Eastern Avenue, all in the City of Baltimore. Charles W. Winters, during that period, was its president, owned all of its stock, and may for the purposes of this opinion be regarded as identical with it. George Winters, a brother of Charles, acted as secretary and treasurer of the corporation, although he had no financial interest in it and owned none of its stock. In connection with its business the corporation owned a number of automobiles, which were kept at one or the other of its garages, and at some time in the month of November, 1927, Charles Winters is said to have suggested to one Myer M. Astrin, then managing the Light Street branch of the business, that he take over that branch. As a result of further negotiations, documents evidencing a sale of the Light Street branch and thirty-four automobiles to Astrin were executed. Those papers were: (1) A bill of sale dated December 14th, 1927, from the Rent-a-Car Company to Myer M. Astrin, trading as Myer's Drive-it-Yourself Company, for thirty-four automobiles for $16,000; (2) a chattel mortgage bearing the same date from Astrin to Rent-a-Car Company on the same property to secure the payment of $15,000, the unpaid balance of the purchase price thereof; (3) a sub-lease also dated December 14th, 1927, from the Rent-a-Car Company to Astrin of the Light Street property. On December 1st, 1927, prior to the execution of the papers, Astrin is said to have taken possession of the automobiles, and on that date a policy was issued by the Globe & Rutgers Fire Insurance Company, the appellee, to the Rent-a-Car Company and the Myer's Drive-it-Yourself Company, insuring them as their interest might appear against loss by fire of thirty-four automobiles to the extent of $13,500.

Between 12.30 and 2.25 o'clock on the morning of January 3rd, 1928, the Light Street garage was found to be on fire,

and as a result of that fire automobiles covered by the policy were damaged. The routine steps to prove the loss and collect the insurance were taken by the assured, but the insurer failed to pay that loss, which was appraised at $5,275, and on May 3rd, 1928, the insured, Astrin, and the appellant, instituted a nonresident attachment proceeding against the appellee to collect it. The trial of the short note case in that proceeding resulted in a verdict and judgment for the defendant, and from that judgment the Rent-a-Car Company appealed to this court. Astrin failing to appeal, the judgment against him was affirmed. *Rent-A-Car Co. v. Globe & Rutgers Fire Ins. Co.*, 158 Md. 169, 148 A. 252. But the judgment against the appellant in this case was reversed and the case remanded for a new trial between it and the insurance company. *Ibid.* The effect of that decision was that Rent-a-Car Company and Astrin, trading as Drive-it-Yourself Company, were severally insured, and that Rent-a-Car Company was not barred from recovering on the policy by the fact that the loss for which it sought to recover was occasioned by the fraud of Astrin, unless it was privy thereto. The fire, the damage, and the appellant's interest in the damaged property were not denied, so that the issue to be tried was whether the damage was caused by any fraudulent act to which the appellant was privy. Upon the remand the case was retried upon that issue, and, the verdict and judgment being for the defendant, the plaintiff has taken this appeal.

In the course of the trial twelve exceptions were reserved, eleven to rulings of the trial court on questions of evidence, and one, the twelfth, to its rulings on the prayers.

To the extent that they are involved in a consideration of those exceptions, the contentions of the parties as to the issues in the case may be thus stated: The appellant contends that, even if the fire which caused the loss which it seeks to recover in this case was of incendiary origin, there was no evidence in the case legally sufficient to convict it of fraudulent or guilty complicity therein, and that, in the absence of such evidence, the fire and the loss having been conceded, it is entitled to recover.

The defendant's theory was that there was in the case evidence legally sufficient to show that the fire was of incendiary origin, and was the result of a fraudulent conspiracy between Charles W. Winters, his brother George Winters, and Myer M. Astrin, the object and purpose of which was to destroy property covered by the policy issued by the appellee to the appellant, in order that the appellant might be indemnified by the appellee in whole or in part for its loss.

As those contentions are reflected not only in the prayers but also in the evidence adduced by the respective parties, for clarity it is necessary to state the nature and scope of the proof offered at the trial.

Charles W. Winters testified that he "owned" the Rent-a-Car Company, that he owned all of its stock, and that nobody but himself "had any money in it"; that negotiations for the sale of the Light Street business and thirty-four automobiles by it to Astrin began the day after Armistice Day, 1926, and that on November 15th, 1926, Astrin made the first payment, $500, in cash, on account of its purchase, and a second payment of $500 by check on December 14th, 1926; that Astrin was a "kind of general collector and adjuster"; that one Judson R. Kezer had for four months prior to the sale been manager of appellant's Light Street business, but left its employ on the night of Armistice Day, 1926, and that a few days later witness "got Astrin to go down and take charge," and then suggested the sale to him; that after December 1st, 1926, he had absolutely no connection with the Light Street business; that his brother George was never connected in any capacity with that branch of the Rent-a-Car Company; that he had seen Astrin at appellant's Baltimore Street office at about 12 o'clock on the night of the fire, and had sent him home in witness' automobile at about 1.15 o'clock that morning; that on that occasion Astrin had given witness two checks, one for his rent and the other for his purchase price installment; that all of the automobiles specified in the policy but six were of 1926 make, and new when purchased. There was also evidence tending to prove the transfer of the Light

Street business from the appellant to Astrin, the execution of the policy of insurance to which reference has been made, and the payment of $125 on account of the first premium of $726.18, ownership of the property covered by the policy by Astrin, the interest of the appellant therein under the chattel mortgage referred to above, damage to the property by fire, and the refusal of the appellee to pay the loss resulting therefrom.

On behalf of the defendant, testimony was given tending to prove alleged facts, which for convenience and brevity will be stated in narrative form as follows:

At about 2.25 or 2.30 o'clock on the morning of January 3rd, 1928, a night watchman employed at 1235 Light Street observed smoke issuing from the second floor of the garage at 1241 Light Street and at once gave the alarm. When fire engines arrived shortly afterwards, the second floor was in flames, and a "heavy black smoke" issuing from it. As soon as the fire was sufficiently controlled to permit an inspection of the second floor of the garage, it was discovered that its entire available space was so closely packed with automobiles that it was impossible for one to pass between them, and that to go from one part of the floor to another it was necessary to climb up on the machines, that there was no "apparent space in there at all except a few feet in from off the tramway"; that there was present a heavy odor of gasoline; that excelsior in the upholstery of several of the cars "had the odor of gasoline"; that the floor in one place was burned through, and near the hole thus formed was an electric soldering or welding iron attached to a drop light cord which was attached to a socket in the ceiling. A further inspection on the following morning disclosed that the fire had been confined largely to the tops of the machines and the ceiling; that in several machines the cotton or excelsior in the upholstery of the cushions was saturated with gasoline; that only the second floor ceiling and the tops of the automobiles stored on that floor were burned; that neither the bottoms nor the tires of those automobiles, except one tire near where the electric

soldering iron was found, were burned, nor was the floor, except.for the hole about two and a half by three and a half feet near that spot.

Judson R. Kezer, an automobile mechanic, had been employed by Rent-a-Car Company in 1926 at its Baltimore Street office. He left it in December, of that year, but returned in April or May, 1927, when he was employed as assistant to George Winters, who was then acting as manager of the Light Street garage, and remained in its service until Armistice Day, 1927. During that period both Charles and George Winters were active in the management of the place,. and Astrin was not only a frequent visitor there, but Kezer, at the direction of Charles or George Winters, referred claims to him as an adjuster for the Rent a-Car Company, and also "turned balance tickets over to him" a number of times. During the latter part of October and early in November Astrin was there "very often," was always "broke," and three or four times a week would borrow small sums of from 50 cents to a dollar from Kezer. The daily average week-day receipts in the spring and early summer of 1927 "ran from $30 to $50," and on Saturdays, Sundays and holidays sometimes "ran as high as $200"; but later in the season they fell off, and in the late summer and early fall averaged less than $10 on week days and $40 to $50 on Sundays and holidays. On or about the 8th, 9th or 10th of November, 1927, Kezer had a conference with Charles and George Winters at the Light Street office, during which a conversation,. which Kezer in his testimony thus describes, took place: "Mr. Charles Winters wanted to know how business was; I told him very bad; if I remember right, we had not done anything that day, had not sent out a car, and Charles Winters said— something has to be done about this—George and I have all the money put up and we have to do something, we cannot continue business this way; and I told him it was no wonder we were not getting the business, the cars were in bad shape, and not spending any money to repair them, and that the people who came there for cars could go to other drive-it-

yourself companies and get new cars for the same price. Mr. Charles Winters said, I know that, Judd; George and I have been talking over a way to overcome that. He said to me— Mr. Charles Winters said to me, Judd, I will tell you what we will do, you and my brother George take the place over on half shares, and have a half interest in it—I spoke up and told him I had no money to go into that, as he well knew. "Q. What? A. I told him I had not any money to put in the business, as he well knew, and even if I did have, I would not want to put any money in a business like that with that kind of cars, and Charles Winters said, That is not what I mean, you don't have to put up any money, he said. The cars are all insured, we will send you some more cars down from Baltimore Street, and the insurance won't be up until around the first of the year, and he said, If you had a fire down here, we will let the insurance company worry about the new cars. I told him he was crazy, I did not want to enter into any proposition like that. Mr. George Winters then spoke up and said, Don't be a damn fool, Judd, this is a chance for all of us to make some money. Q. Did Charles Winters say anything to that? A. Charles Winters said, Well, other people got away with it, why can't we."

Kezer refused to take part in the proposed scheme, and a day or two later was discharged for absenting himself from the garage without leave. When he left the appellant's garage he went to work for "O'Brien Brothers across the alley," and, while working for them, about December 1st, 1927, he met Charles Winters, who told him that he had better stay out of that neighborhood, and said to him, "You are hanging around down here and hurting my business."

On January 1st, 1928, Harry Aspelmeyer, aged nineteen years, who was then out of work, was employed by Astrin to work about the garage. He remained there until about midnight, and was told by Astrin to return the next morning, which he did. Astrin arrived at about ten o'clock that morning, and about twenty minutes later George Winters "came down in a machine" which had a flat tire. After Aspelmeyer

258

and Marshall, a colored man also employed by Astrin, had replaced the tire, Aspelmeyer was told to get a droplight and soldering iron from the office, and some long strips of board, and place them in Winters' automobile. He did as he was told, and Winters drove away. Then, at the direction of Astrin, Aspelmeyer, Marshall, and a colored man "named Freddy," who had brought down a couple of cars "from the Baltimore Street place," began to shift cars from the second to the first floor of the garage, and back, until the second floor was so closely packed with automobiles that no walking space was left. During the day, in addition to the cars already there, others were brought down from the Baltimore Street garage, and although "plenty of people" came there that day to rent cars, Astrin told Aspelmeyer and Marshall to direct them to "the Baltimore Street place, that something was wrong with the cars." About "quarter to nine o'clock or nine o'clock" that evening Astrin drove Marshall and a girl employed in a nearby store to their homes and returned at about ten o'clock, and brought with him the "electric soldering iron and the droplight." He left the soldering iron on a desk in the office, but directed Aspelmeyer to take the droplight to the second floor, where, at Astrin's order, he connected it to a socket in the ceiling, and when the connection was completed the current lighted the bulb to which the cord was attached. He then, at Astrin's order, took the bulb out and placed it between the fenders and hood of the machine, and at Astrin's direction went downstairs and left Astrin there. Astrin came down about five minutes later and shortly after that drove away. Later in the evening a customer returned a rented car and asked for his deposit. Aspelmeyer thereupon called Astrin over the telephone and found him at the Rent-a-Car garage on Baltimore Street. He at once returned to the Light Street garage, and brought with him two five-gallon cans marked "Amoco gas," which he carried as though they were heavy, and which he took to the second floor of the garage. Although the water in the place was frozen, shortly after Astrin went to the second floor

Aspelmeyer heard a sound like water dripping on the concrete floor. Astrin came down to answer a telephone call, but later returned to the second floor and brought the cans down, and gave them to Aspelmeyer to put in his car, and at that time they were empty. Astrin then "rushed" Aspelmeyer out of the garage, and Aspelmeyer went to his home and Astrin drove away. When Aspelmeyer reached his home about a block and a half away, it was a quarter after one o'clock in the morning.

There was also evidence tending to show that the automobiles stored on the second floor of the Light Street garage "were a miscellaneous collection of old dilapidated-looking automobiles," and that the telephone in that garage at the time of the fire was in the name of Rent-a-Car Company.

While these facts have been stated in narrative form, it does not follow that as facts they were undisputed or actually established at the trial. On the contrary, many of them vital to the defendant's contention were flatly and categorically denied by plaintiff's witnesses. But as this court is concerned alone with their legal sufficiency to establish the defendant's contention that the fire was the result of a fraudulent conspiracy in which the plaintiff participated, and with their relation to the issues in the case and to the exceptions in the record, it is not at liberty to consider that conflict, which was essentially and solely a question for the jury. In the trial court the issues were: (1) Did the facts to which reference has been made exist, and (2) if they did, what was their legal effect? The second issue alone is open in this court. It is therefore not necessary to say anything more of the evidence offered by the plaintiff than that it did contradict facts which were an essential predicate of the defendant's contention that the fire was caused by a fraudulent conspiracy to which the plaintiff was a guilty party. *Purdum v. Edwards,* 155 Md. 187, 141 A. 550; *Abuc Trading Corp. v. Jennings,* 151 Md. 392, 135 A. 166; *Griffith v. Benzinger,* 144 Md. 598, 125 A. 512.

Exceptions one and two deal with the action of the court in allowing the witness Judson R. Kezer to testify to the

financial condition of the Light Street garage business prior to its transfer to Astrin. While the degree of certainty differs, there is no difference in the principles controlling the admissibility of evidence in civil and criminal cases to show a fraudulent conspiracy. 12 *C. J.* 634; 5 *R. C. L.* 1103.

In civil cases, to be the basis of an action, fraudulent "conspiracy" may be defined as the confederation of two or more persons to cheat and defraud, which design was in fact executed by the confederates, with resulting damage to its victim. *State v. Buchanan,* 5 H. & J. 351; 12 *C. J.* 581; *Robertson v. Parks,* 76 Md. 118, 24 A 411; *Brinkley v. Platt,* 40 Md. 529; *Kimball v. Harman,* 34 Md. 407.

In this case the defendant has suffered no actual loss because it has not paid to the plaintiff anything on account of the damage it suffered as a result of the fire. But the alleged unlawful combination, if it existed, was so integrated with the fraud set up as a defense that it is analogous to a conspiracy in civil actions at common law, and the admissibility of evidence to prove it should be governed by the principles applicable to such cases.

In *East's Pleas of the Crown,* pp. 37, 38, in speaking of treasonable conspiracies, the author says: "In this, as in other cases founded in conspiracy, the conspiracy or agreement among several to act in concert together for a particular end must be established by proof, before any evidence can be given of the acts of any person not in the presence of the prisoner. And this must, generally speaking, be done by evidence of the party's own acts, and cannot be collected from the acts of others, independent of his own; as by express evidence of the fact of a previous conspiracy together, or of a concurrent knowledge and approbation of each other's acts. But it may also be done by evidence of the acts of the prisoner, and of any other with whom he is attempted to be so connected, concurring together at the same time and to the same purpose or particular object. And here the evidence of a conspiracy is more or less strong, according to the publicity or privacy of the object of such concurrence, and, the greater or less degree of similarity in the means em-

ployed to effect it. The more secret the one, and the greater the coincidence in the other, the stronger is the evidence of a conspiracy." The fact of conspiracy may be proved by either direct or circumstantial evidence. 12 *C. J.* 635; 5 *R. C. L.* 1103, 1104. The acts of the alleged coconspirators and the circumstances surrounding the transaction which is the basis of the charge may be shown to prove the conspiracy, if they are of a character and so connected as to justify the inference that the acts sought to be shown were done in the execution of a common design. 12 *C. J.* 634 *et seq.* Nor is it necessary that any particular order be followed in adducing such proof, it being sufficient if the connection and inculpating significance of the facts appear from the whole evidence in whatever order it may be given. *Bloomer v. State,* 48 Md. 521. Because of the clandestine nature of the offense, and the secrecy which usually shrouds acts done to accomplish it, much latitude is allowed in admitting evidence offered to prove it, and any evidence which has a natural and apparent tendency to establish the ultimate issue of conspiracy is usually admitted. 12 *C. J.* 634; *Underhill on Cr. Ev.,* sec. 491; 6 *R. C. L.* 1103. So, upon that principle, evidence of motive, as where, in a prosecution for conspiracy to defraud an insurance company by false representations as to the cause of the fire and the value of property destroyed thereby, the state was allowed to show that the defendant was greatly in need of money (*People v. Darr,* 262 Ill. 202, 104 N. E. 389; *Id.,* 179 Ill. App. 130), of concurrent knowledge and approval by the alleged conspirators of the acts of each other (*Gardner v. Preston,* 2 Day [Conn.], 205), of previous intimacy between the alleged conspirators (*United States v. Green* [D. C.], 146 F. 803), has been held admissible. And upon the same principle we have no hesitation in affirming the rulings involved in the first and second exceptions.

Exceptions three, four and seven relate to the action of the trial court in admitting evidence of a conversation between Charles W. Winters, George Winters and Judson R. Kezer at the Light Street garage on the 8th, 9th or 10th of

November, 1927, in which in effect Charles Winters proposed to Kezer that he procure the garage to be set on fire in order to collect insurance on automobiles stored therein.

Charles Winters, upon the uncontradicted evidence, was so far identified with the appellant as to bind it by his acts and declarations. The evidence offered, if true, indicated an intention on the part of George and Charles Winters to commit the very fraud which was set up as a defense to the appellant's action for damages for loss occasioned by just such a fire as that spoken of in their conversation, and other evidence in the case was sufficient to establish *prima facie* proof of a conspiracy between Charles and George Winters and Astrin to commit that fraud. The evidence tended to show that prior to December 1st, 1927, appellant never carried insurance on its cars, that at that time it transferred its Light Street branch and thirty-four automobiles to Myer M. Astrin, that just prior to the transfer Astrin was without apparent resources, impecunious, and borrowing sums as small as fifty cents from a mechanic employed in that garage; that, after Kezer refused to be a party to the proposed fraud, Astrin was employed by the appellant to take charge of the garage; that, although Charles Winters knew nothing of Astrin's financial responsibility, appellant transferred to him the Light Street garage, business and thirty-four automobiles, which Winters valued at $16,000, taking from Astrin a chattel mortgage on the automobiles for $15,000 of that sum; that the automobiles were insured for more than their value, appeared old and dilapidated, that immediately prior to the transfer the business had fallen off so that it was no longer profitable, because the cars were "old and not in condition"; that after the transfer Charles Winters referred to the Light Street garage as his business; that on the day of the fire a number of automobiles were transferred from appellant's Baltimore Street garage to the Light Street property; that that garage was set on fire by Astrin, and that immediately prior to the fire Astrin was in the appellant's garage on Baltimore Street; that the instrumentality which caused the fire was on the day of the fire delivered at Astrin's order to

George Winters, who left the garage with it, and that Astrin later returned it to the garage, having obtained it in the meantime either directly or indirectly from George Winters; that on the day of the fire patrons desiring to rent cars were, except in one instance, sent from the Light Street garage to appellant's place on Baltimore Street. Assuming the truth of that evidence, which for the purpose of these exceptions we are required to do, it is legally sufficient to establish *prima facie* a conspiracy between the two Winters brothers and Astrin to perpetrate the fraud which the defendant has set up as a defense to this action, and the conversation was relevant to show purpose and intent. The rulings involved in these exceptions will therefore be affirmed.

In the course of the redirect examination of the witness Kezer, he was asked to repeat a conversation which he had had with Charles Winters about December 1st, 1927, near the Light Street garage, in which Winters told Kezer to stay away from that neighborhood because he was hurting "my business." The witness over objection was allowed to answer the question. We find no error in that ruling, as the evidence was admissible, not only to contradict Winters, who had testified that he had transferred the business to Astrin, but as substantive evidence of Winters' connection with the business at that time.

The sixth exception was to the refusal of the court to strike out the evidence of one Edward H. Warr that the soldering iron offered in evidence was the cause of the fire. Warr was chief of the Baltimore Salvage Corps and had had fifteen years' experience with that company in fighting fires. He had testified that, as soon as possible after the fire, he had inspected the second floor of the Light Street garage and had found there a soldering iron attached to a droplight cord which was also attached to a light socket in the ceiling, and that near the iron was a hole about two and a half feet wide by three and a half feet long burned through the floor, that he had experimented with the iron and had found that it would char wood, but would not cause a blaze, and he was then permitted without objection to state that in

his opinion the fire was caused by the iron; that "it being placed there and the iron becoming real hot, charred the floor, which was of yellow or Georgia pine, and became a slow burning fire, and when it burned to the floor below, it then gave a chance to ignite the gasoline that was in evidence, the fumes found in the building when he entered, and that caused the explosion."

There was not the slightest evidence that the witness had ever known a fire to have been caused in that manner, that he was more familiar with the conditions under which gasoline vapor would explode, or that he was by knowledge or experience better qualified to express an opinion as to the cause of the fire, than the jury. Under such circumstances, if timely objection had been made, the answer should and no doubt would have been stricken out. 1 *Carter's Digest* 658, 659. Later the court asked the witness what evidence he had that the iron was hot, and he replied that his information was that the current had been on when the garage was closed. The defendant then offered to show that the current had been on that night before the place was closed. The court then stated that: "I will give Mr. Ward the right to move to strike this out if it is not followed up. It is in subject to exception, therefore." It is not apparent from that statement whether the ruling related to evidence already in without objection, or to the witness' answer to the court's question, and for that reason the motion to strike out Warr's opinion as to the cause of the fire, which was in without objection, was properly overruled.

Nor for reasons already given was there any error in the rulings involved in the eighth, ninth and eleventh exceptions.

The plaintiff offered nine prayers, of which the court granted those numbered two, three, four and one-half, five, five and one-half, and six, and refused the others; the defendant offered fourteen, of which the second, fourth, seventh, eleventh and fourteenth were granted and the others refused. Those rulings are the subject of the twelfth exception. The plaintiff's first, seventh and eighth prayers were properly refused. They all were predicated upon a common hypothesis

that no evidence had been offered in the case to show a confederation between Charles W. Winters, George Winters and Myer M. Astrin to burn the Light Street garage for the purpose of collecting the insurance on automobiles stored there. For reasons already stated, and which need not be repeated, in the opinion of this court there was some evidence of such a confederation, and the question therefore became one for the jury to decide. The prayers were also objectionable in form because they submitted no question for the consideration of the court. They were based upon a general failure of the evidence, and raised no question as to its legal sufficiency. Such a prayer has repeatedly been held to be too indefinite and general to submit a legal proposition. *Auburn Shale Brick Co. v. Cowan,* 125 Md. 225, 93 A. 443; *Taylor v. Commrs. of Perryville,* 132 Md. 414, 104 A. 475. And these prayers were also properly refused for that reason.

The defendant's second and fourth prayers both involve the proposition that if Charles W. Winters "instigated, originated, had knowledge of, consented to, acquiesced in, or participated in any way" in any "plan, conspiracy, scheme or connivance" to burn "the property in question" and "mentioned in the evidence" and owned a majority of the stock of the appellant company, and was its president and in control of it, the appellant was not entitled to recover. That statement of the law was incorrect and both prayers should have been refused. The several postulates enumerated as sufficient to bar a recovery are stated severally and disjunctively, so that under the prayers as granted the jury would have been required to find their verdict for the defendant if Winters participated "in any way" in the plan to burn the property, even though such participation was wholly innocent and without any knowledge that a conspiracy existed or that what he did had the effect of aiding it. The statement that the appellant corporation was bound by the acts of Winters because he was its president, owned a majority of its stock, and controlled it, while harmless in this case, was also too general and indefinite a statement of the law. For the purposes of this case Winters was the corporation and

the corporation was Winters. But it is not correct to say that in every case a corporation is bound by the torts or crimes of its stockholders or the officers in control of it, whether authorized or not. While, upon the facts of this case, it appears improbable that the jury were actually misled by these inaccuracies and omissions, and we would not feel justified in reversing the judgment because of the rulings in respect to those prayers, they should have nevertheless been refused.

The defendant's seventh prayer, which instructed the jury as to their duty in considering the evidence, was prefaced by the statement that, "The court instructs the jury that whenever fraudulent acts are done or attempted, the parties guilty thereof usually conceal their acts, and in the nature of things, the evidence in proof of such charges will, in general, be circumstantial." That statement was a mere general abstraction more in the nature of an argument than a legal proposition, and had no proper place in such an instruction. *Frentz v. Schwarze,* 122 Md. 19, 89 A. 439; *Fait v. Bannon,* 127 Md. 698, 97 A. 880. And while upon the facts of this case we would be unwilling to reverse the judgment for that error, we deem it proper to say that under the practice prevailing in this state the statement quoted should have been omitted from the prayer. *North Chesapeake Beach Land Co. v. Cochran,* 156 Md. 532, 144 A. 505.

There was also error in granting defendant's eleventh prayer. By it the jury were told that if they found "that the plaintiff, through its president and owner, transferred the property in question to Myer Astrin, for the purpose of having said Astrin procure, or with the knowledge that said Astrin would procure, insurance thereon, in accordance with the terms of the chattel mortgage offered in evidence in the case, and if the jury further find that the said plaintiff, through its president and owner, intended and expected that the property in question should be set fire to and burned by Astrin and that Astrin did set fire to said property," their verdict should be for the defendant. The effect of that prayer was to tell the jury that, if they believed that when appel-

lant transferred the Light Street business to Astrin, Winters, knowing that Astrin would insure it, "intended and expected" that Astrin would burn it, and that Astrin did burn it, the appellant could not recover, even though Winters did not communicate to any one his intentions or expectations, and even though he took no part whatever in the fraudulent destruction of the insured property. Mere thoughts, hopes, intentions, or expectations, no matter how evil or wicked they may be, cannot form the basis of a legal conclusion, unless they are translated into acts or words or conduct which permit an inference that the person to whom they are attributed in fact participated in consummating some fraudulent or unlawful design. The proverb that "as he thinketh in his heart, so is he," unless the intent is given effect, forms no part of the common or statute law of this state. Appellee relies upon expressions in the opinion in *Rent-A-Car Co. v. Globe & Rutgers Indemnity Co.*, in support of its second, fourth, seventh, and eleventh prayers; but we are able to discover nothing in that opinion to warrant any such conclusion.

By defendant's fourteenth prayer the jury were told that "by the phrase 'preponderance of the evidence,' mentioned in the plaintiff's sixth prayer, the law does not mean to indicate any particular degree of certainty to which the proof must go; it simply means that the evidence in favor of the defendant must, to the minds of the jury, be more weighty and more satisfactory than the evidence of the plaintiff upon the same point." Upon the facts of this case that prayer was insufficient and misleading. The defense in this case amounted to a charge that the appellant, its officers and employee, had committed a serious criminal offense. In such cases the rule in England is that even in civil cases something more than a mere preponderance of evidence is required to establish guilt (*Jones on Evidence*, secs. 16, 195; *Stephens' Evidence*, 94), and, whatever the law may be elsewhere, that appears to be the law of this state. In *Corner v. Pendleton*, 8 Md. 347, a civil case where the issue was embezzlement, it was said: "Depending upon circumstantial evidence, and involving moral delinquency, not to say criminal offense, by the clerk,

we think the inference should be so strong as to exclude the presumption that he obtained the money elsewhere." In *Balto. & O. R. Co. v. Shipley*, 39 Md. 251, the court, while not citing *Corner v. Pendleton, supra*, said this: "There is a well recognized distinction in regard to the degree or quantity of proof in the trial of civil and criminal causes. In the latter, the presumption of innocence is so strong, that the law in favor of life and liberty requires the fact of criminality to be established, to the exclusion of every other reasonable hypothesis, or, in other words, to a moral certainty. In mere civil disputes, however, where no violation of the law is in question, and no legal presumption operates in favor of either party, the preponderance of probability, due regard being had to the burden of proof, may constitute sufficient ground for a verdict." *Corner v. Pendleton* was cited with approval, however, in *Thompson v. Williams*, 100 Md. 199, 60 A. 26, and the rule has long been recognized in cases for divorce on the ground of adultery, of which *Thiess v. Thiess*, 124 Md. 296, 92 A. 922, is a type. And the general rule is stated as follows in *Jones on Evidence*, sec. 195: "When fraud or criminal conduct is imputed the decisions frequently declare that something more than a mere preponderance of evidence must be produced, and that the proof must be clear and satisfactory." The statement in the prayer therefore that the phrase "preponderance of the evidence" did not import any "particular degree of certainty" was erroneous and misleading in this case, for the evidence to sustain the charge of fraud, which involved the commission of a grave crime, should at least have been sufficiently certain to overcome the presumption of innocence which shielded the plaintiff and its agents. The prayer should therefore have been refused.

For the error involved in granting the appellee's second, fourth, eleventh, and fourteenth prayers it will be necessary to reverse the judgment from which this appeal was taken, and remand the case for a new trial.

*Judgment reversed, and case remanded for a new trial, with costs to the appellant.*

Bond, C. J., filed the following opinion:

The second, fourth, and eleventh prayers of the defendant, whatever defects may be found in their wording, would seem to me likely to have conveyed to the jury the meanings intended and to have served their purposes without misleading. I therefore think it was proper to grant them.