RENT-A-CAR COMPANY *v.* GLOBE & RUTGERS
FIRE INSURANCE COMPANY.
[No. 52, October Term, 1932.]

*Decided January 11th, 1933.*

The cause was argued before Bond, C. J., Urner, Adkins, Offutt, Digges, and Parke, JJ.

*Richard E. Preece* and *Leon H. A. Pierson,* for the appellant.

*Howard A. Sweeten* and *Zanvyl Krieger,* with whom were *Weinberg & Sweeten* on the brief, for the appellee.

Digges, J., delivered the opinion of the Court.

This is the third time this court has been called upon to consider the contentions between the parties to this appeal. The case has been three times submitted to a jury, resulting each time in a verdict for the defendant below, appellee here. In the first appeal, *Rent-A-Car Co. v. Globe & Rutgers Fire Ins. Co.,* 158 Md. 169, 148 A. 252, the case was reversed because of the granting by the trial court of prayers which

held that, where a policy of fire insurance named the mortgagor and mortgagee as the assured and made the loss payable to the assured, as interest might appear, and where the evidence showed that the mortgagor had set fire to and destroyed the property, such fact constituted a defense against the mortgagee also, even though the mortgagee was entirely innocent of any participation in, or knowledge of, the incendiary act of the mortgagor. In the second appeal (161 Md. 249, 156 A. 847), the judgment was also reversed for the granting of erroneous prayers. In the last mentioned case it was held that the defendant's demurrer prayers were properly overruled; this court thereby deciding that there was sufficient evidence of the appellant's participation in or connection with a conspiracy to set fire to and destroy the insured property. On this appeal the appellant urges reversible error on three principal grounds: First, because of improper remarks of appellee's counsel in his opening statement to the jury; second, because of a conversation had between a juror and one of the witnesses for the defendant; and, third, because of error of the trial court in its ruling on the prayers.

The facts in this case have been stated by this court at length in the two previous appeals, and it is therefore unnecessary to again detail them. Suffice it to say that the evidence as shown by the present record is substantially the same as in the preceding appeals. There is the testimony of several witnesses in the present record who gave evidence for the first time, but their testimony deals with the movements of George Winters on the night of January 2-3, 1928, the time of the fire, tending to show that he was not in the neighborhood of the property, wherein the fire took place, at any time during that night; such evidence not affecting the legal propositions now before us for determination. We will consider the contentions of the appellant in the order in which we have stated them.

The record discloses the following:

"During the opening statement of the defendant, the plaintiff excepted to a remark made by Mr. Weinberg to the effect that the plaintiff had Kezer arrested. (The Court): I think

I know what you are going to say and unless you press it we will meet it when the testimony comes in. (Mr. Weinberg): I do not think it is terribly material although I think it has been ruled on by the Court of Appeals. We will offer it at the proper time. (The Court): I do not think it has the importance that counsel seem to attach to it. (Mr. Weinberg): Well, at any rate, something happened to Kezer. (Mr. Pierson): At this point we object to that remark. (Objection overruled; exception noted)."

In the previous trial the witness Kezer had testified that Charles Winters, the president and owner of all the stock of the appellant, and his brother George Winters, had, at a time shortly prior to the sale of the property to Astrin, suggested to the witness that, if they had a fire resulting in the destruction of the personal property, to wit, the automobiles used at 1239 and 1241 Light Street, the insurance company would have to worry about the condition of the automobiles; the witness having stated to the Winters that business had fallen by reason of the dilapidated condition and want of repair of the automobiles. Witness further stated that, after he had left the employ of Winters, he went to work for O'Brien Bros., a general garage and repair shop next door to the Light Street branch of the Rent-A-Car Company; that he met Charles Winters in the alley dividing the two properties: that Winters said: "What are you doing here? You better stay away from this neighborhood; you will hurt my business"; that subsequently he was arrested on a charge of embezzlement of $2.50 from the appellant; that the witnesses at the preliminary hearing, and at the trial of the case, which resulted in acquittal, were Charles W. Winters, George Winters, and Myer Astrin. This witness further testified that, at the time at which the Winters had the conversation with him in reference to the insurance on the cars, Charles Winters desired him and George Winters to operate the Light Street branch on shares, and he (the witness) said: "Mr. Winters, I haven't any money to go into this business"; Winters said: "I know you haven't; you don't need any money; I will turn the place over to you and George to work together—you only

have twelve cars down here, I will send more from the main office, give you a good bunch of cars, we will have a fire down here and let the insurance company worry about the automobiles"; "I got frightened and I told both of them I didn't care to enter into such a proposition, and Mr. George Winters said, 'Don't be a damned fool, Jud, this is a chance for all of us to make money.' I said I was disinterested and afraid. Mr. Charles Winters said, 'Other people get away with it, why can't we?'"

The opening statement of the defendant's counsel had for its legitimate purpose an outlining of the defendant's case, stating to the jury what it expected to prove. We think this statement was entirely legitimate and proper under the circumstances. If later evidence was offered to prove the opening statement of counsel for the defendant, its admissibility could then be passed upon. If such evidence was held admissible, there could be no possible legal objection to the opening statement of defendant's counsel. If plaintiff believed such evidence was inadmissible, he could fully protect his rights by objecting to its admission and by proper exception have the admissibility *vel non* passed upon on appeal. As a matter of fact, the witness Kezer's testimony on this point was offered and submitted to the jury without objection. Neither was this testimony denied or in any manner contradicted. Under such circumstances, it became legal evidence in the case, and the statement by counsel at the opening of the case that Winters had brought about Kezer's arrest was confirmed by testimony unobjected to and unimpeached. In *Hyatt on Trials,* sec. 1453, the rule is thus stated: "If the statement is made in good faith, relying upon the production of proof, while improper in any case, it is not reversible error. The abuse of privilege must be a plain case and the statement must be plainly made in bad faith or made in a gross misconception of what is admissible resulting in bringing to the attention of the jury wholly irrelevant matters and of a nature calculated to create so profound a prejudice that it can not be eliminated by the charge of the court to justify a reversal."

In this case the evidence subsequently offered was relevant, and was admitted without objection.

. The second contention of the appellant arises out of these facts: During the progress of the trial and near its beginning, counsel for the appellant brought to the attention of the court alleged misconduct of a juror; this misconduct being a conversation between the juror and a witness for the appellee occurring in the corridor outside of the courtroom. Upon being thus advised, the court suspended the trial and retired to his chambers, where, in the presence of counsel for the parties, the juror in question and other witnesses, after being sworn, were examined by the court and counsel as to the conversation and circumstances surrounding the alleged misconduct. This examination was insisted upon by the appellant and acquiesced in by the appellee. The witness Warr, with whom the juror had the conversation, was chief of the salvage corps and was an acquaintance of the juror. According to Charles W. Winters, the president of the appellant, the conversation was with regard to the former trials of this case. His account of the conversation was as follows:

"Q. What did you hear? A. This gentleman came in the door (indicating the juror) from St. Paul Street, and Chief Warr, and I don't know whether another fireman or police was standing with their back towards him, and he walked up to Chief Warr and kind of run into his shoulder and said, pardon me, Chief, good morning, and he shook hands, and shook hands with the other gentleman with the Chief, and this gentleman said, did you have a hard day in Washington yesterday, or did you have a good trip, I understood him to say, and Chief Warr said, yes, it was hard work, I have to go back there tomorrow. I walked away and they stood there talking, and later I came up alongside of them and I heard him say to Chief Warr, was the other case tried in Annapolis or in Baltimore, the first case, and he says, tried in Baltimore, and he said, the second case too, and Chief Warr said, yes, and he said, who won them, and Chief Warr said, we did, and I walked away."

The juror and Aspelmeyer both testified that the conversation consisted of an inquiry by the juror as to where the previous trials were had, and the answer of Warr that they were both held in Baltimore; but that there was absolutely no inquiry as to the result of those trials, and no information as to such result given to the juror.

After the taking of this testimony in chambers, all of the witnesses thus examined were excused by the court, except the juror Custer; after which:

"(The Court): Mr. Custer, will you tell me something about yourself? You live here in Baltimore? A. Yes, sir. Q. And you have been here for how many years? A. I have been here since December, 1912. Q. What is your occupation? A. At present I am the new business manager of the National Central Bank. Q. What was your occupation before that time? A. Before that for twelve years I was the representative of the Comptometer Calculating Machine, made by a Chicago company, and handled the State of Maryland in the sales, my office being in the Fidelity Building. Q. (The Court): Mr. Custer, there is a sharp conflict of testimony between you and the plaintiff in this case, and while I cannot afford to have the cases go off, mistrials had, because of assertions made by any one touching the qualifications of jurors after they have been sworn, it is possibly natural that you might feel some resentment from this little examination that has taken place, and I want to ask you, still under the sanctity of the oath which has been given to you as a juror, whether you feel that you can fairly and impartially try this case and decide it entirely on the merits of the controversy based entirely upon the testimony that is produced in court and the instructions of the court and do what in your conscientious judgment and opinion is justice to both sides? A. I feel I can, yes, sir. (The Court): All right, we will go on with the case. (Mr. Custer): I want to thank you gentlemen. I feel no resentment at all about it."

Thereupon the juror withdrew. After which:

"(The Court): I would like to have noted in this record that before making this examination of the witnesses I stated

to Mr. Preece and Mr. Pierson that if I did examine the persons interested in this conversation that it might have the effect of making the juror resentful, but that Mr. Pierson and Mr. Preece insisted upon the examination being made by the judge. Mr. Preece moves that a juror be withdrawn. (Mr. Preece) : After examination of the juror and Mr. Warr, a witness for the defense, who had had the conversation with juror Custer, and this witness, Aspelmeyer, who denied the purport of the conversation, thereupon Charles Winters, the plaintiff, the complainant against the juror, was called, who stated that the result of the two previous trials in the case had been discussed between juror Custer and Chief Warr, the defendant's witness, and that Chief Warr stated that the results were a verdict for the defendant, and the motion was thereupon made by plaintiff's counsel that the court withdraw a juror and declare a mistrial, which motion was overruled and exception noted."

Not every trivial act on the part of a juror during the course of the trial amounts to such misconduct as requires the withdrawal of a juror and the continuance of the case. A contrary holding would result in a multiplication of mistrials, with attendant additional expense and delay. There are many cases where the misconduct of the jury is sufficient to require an order of mistrial, but the misconduct must be such as to reasonably indicate that a fair and impartial trial could not be had under the circumstances. In 16 *R. C. L.* 312, sec. 120, it is stated: "Misconduct must, however, be such as to warrant the belief that the fairness and propriety of the trial have been impaired, that injury has resulted therefrom." *Warner v. State,* 56 N. J. Law, 686, 29 A. 505. In *Commonwealth v. White,* 147 Mass. 76, 16 N. E. 707, 710, the court said: "Remarks made in the presence or hearing of jurors as to cases on trial cannot always be prevented. Jurors are presumed to be, and are, with those exceptions that must always exist, men of intelligence, of good moral character, and fully competent and desirous to do their duty in the matters submitted to them. It is not to be presumed that they will be affected by casual observations made in their

presence, or even to them. It is for the judge in each instance to determine whether what has taken place is of this incidental character, or whether conversations or solicitations have been addressed to them, of such a nature that their effect must fairly be held to have been to deprive the injured party of a fair and impartial trial. Where a party to a suit has been guilty of countenancing or promoting an interference with the jury, a stricter rule would be adopted as against him than where this interference was the act of another, even of one of his own witnesses, acting without any countenance from him." In *Commonwealth v. Poisson*, 157 Mass. 510, 32 N. E. 906, 907, after the jury had had the case under consideration for several hours, they came into court for further instructions. The judge asked the foreman if the jury desired further instructions. The foreman then said: "This man here (pointing with his finger to the juror near him) would like to have further instructions." In passing upon this alleged misconduct, the court, speaking through Justice Holmes, said: "The presiding justice was the best judge whether it did any harm in this particular case. If he had given the defendant a new trial his decision would not have been open to criticism, and we cannot say that he was wrong in refusing one."

The better rule in such cases would seem to be that such questions be left to the sound discretion of the trial court, whose decision should only be disturbed in those cases where there has been a plain abuse of discretion, resulting in palpable injustice. Especially should this be true in cases where there is conflict of evidence as to whether the act constituting the alleged misconduct in fact occurred. *Epps v. State*, 102 Md. 539, 1 N. E. 491, at page 501; *Hodges v. Bales*, 102 Ind. 494, 1 N. E. 692, at page 695.

In the present case all of the witnesses agree that the juror received information as to the situs of the two previous trials; the conflict being as to information given by Warr to the juror as to the result of those trials. There can be no question that information conveyed to a juror of the place where

a previous trial of the case has been had is not sufficient to declare a mistrial. It cannot be denied that the quality of the testimony produced, to the effect that no information was asked by or given to the juror in reference to the result of the previous trials, is as worthy of belief as that of Winters in contradiction. The quality of the testimony being the same, the quantity, and therefore the weight, of the evidence sustains the decision reached by the trial court. Jurors are usually men of intelligence, and it is difficult to conceive that in the retrial of a case some of them at least do not know that there has been a previous trial; and especially is this true in the counties of the state. If we admit that the testimony given by Winters was true, and all other testimony false, and that the juror was told of the result of the two previous trials, it is not clear that such information prejudiced the appellant; for assuming, as we must, that the juror Custer was of average intelligence, he must have known that there had been two reversals in favor of the appellant, which knowledge would naturally be to the benefit of the appellant, or which at least would neutralize the alleged effect of information as to the outcome of the previous trials. *Brawner v. Hooper,* 151 Md. 579, at pages 593, 594, 135 A. 420. There was no abuse of discretion in this case.

Finally, the appellant contends that the first, second, third, fourth, sixth, and seventh prayers granted at the instance of the defendant are erroneous; and specially excepted to the second, third, sixth, and seventh of said prayers on the ground that there is no evidence in the case to support them. These exceptions were properly overruled, as in our opinion there is evidence, if believed by the jury, from which they could find the facts stated in the prayers. 161 Md. 249, at pages 264, 265, 156 A. 847. The appellant further contends that the theory embodied in these prayers was condemned by this court in the former trial of this case reported in 161 Md. 249, 156 A. 847, 854. In the last appeal the court, speaking through Judge Offutt, said: "The defendant's second and fourth prayers both involve the proposition that if Charles W. Winters 'instigated, originated, had knowledge of, con-

sented to, acquiesced in, or participated in any way' in any 'plan, conspiracy, scheme or connivance' to burn 'the property in question' and 'mentioned in the evidence' and owned a majority of the stock of the appellant company, and was its president and in control of it, the appellant was not entitled to recover. That statement of the law was incorrect and both prayers should have been refused. The several postulates enumerated as sufficient to bar a recovery are stated severally and disjunctively, so that under the prayers as granted the jury would have been required to find their verdict for the defendant if Winters participated 'in any way' in the plan to burn the property, even though such participation was wholly innocent and without any knowledge that a conspiracy existed or that what he did had the effect of aiding it." It was there held that, under the instructions contained in the defendant's second and fourth prayers, if the jury found that Charles W. Winters participated in any way in the plan to burn the property, their verdict should be for the defendant, even though his act was entirely innocent and without any intention or design to commit a fraud or crime in connection with the burning of the property. To illustrate, under those instructions, if Charles W. Winters had sold the gasoline which Astrin was shown to have used in making the second floor of the garage more easily inflammable, Winters could have been said to have "in some way participated" in bringing about the fire, even though he had absolutely no knowledge of what the gasoline was to be used for by Astrin, or any intention to have it so used. We do not think the prayers in this case are open to that objection. The granted prayers, both plaintiff's and defendant's, properly stated the law as determined by this court in the previous decision, and fully and fairly presented the plaintiff's case to the jury. There was no error in the ruling on the prayers.

*Judgment affirmed, with costs.*