LIGGETT & MYERS TOBACCO CO., Inc., v. IMBRAGUGLIA et al.

Civil Action No. 2976.

District Court, D. Maryland.

Sept. 26, 1947.

Emanuel Gorfine and Joseph G. Finnerty, both of Baltimore, Md., for plaintiff.

Robert E. Coughlan, T. Barton Harrington, Edwin J. Wolf, J. Edgar Harvey and G. C. A. Anderson, all of Baltimore, Md., for defendants.

**WILLIAM C. COLEMAN, District Judge.**

This suit is now before the Court on motions for a new trial by the four defendants, following verdict by a jury and judgment against them, jointly and severally, in favor of the plaintiff for the sum claimed, namely, $22,728.87, with interest.

The action was originally instituted by the plaintiff, Liggett & Myers Tobacco Company, Inc., a New Jersey corporation, for the benefit of Atlas Assurance Company, Ltd., a British company, against the four individual defendants, all citizens of Maryland, for the purpose of obtaining for the Atlas Company reimbursement of the payment which it had made in accordance with the terms of its policy of insurance, to the Tobacco Company, for the loss of a shipment of cigarettes, the property of the Tobacco Company, while in transit from Richmond, Virginia, to consignees in Baltimore.

Prior to the institution of the present suit, in which the jurisdictional requirements as to diversity of citizenship and amount involved are satisfied, two of the defendants, Grove and Imbraguglia, had been convicted in the Criminal Court of Baltimore City of having feloniously participated in receiving and secreting the cigarettes, knowing them to have been stolen. As part of their sentence, they were directed to, and did make restitution to the Atlas Company in the sum of $8100, thereby reducing the loss sustained by it to $22,728.87, for which the present action is brought by the Tobacco Company on behalf of the Atlas Company, claiming that all four of the present defendants, knowing the shipment of cigarettes to have been stolen, and with intent to deprive the Tobacco Company of the shipment, conspired together to acquire and secrete, and did acquire and secrete the cigarettes and later dispose of them in such manner that they were never recovered.

In defendants' motions for a new trial, four grounds, identical with respect to each defendant, are asserted as follows: (1) There was no substantial evidence to sustain the verdict; (2) the verdict was excessive; (3) the Court failed to grant defendants' motions for a directed verdict; and (4) there were errors in the instructions of the Court, particularly with regard to the requisite proof for establishing conspiracy to convert the cigarettes. With respect to only two of the defendants, Tamburo and Grove, the additional ground was asserted that the jurors were guilty of misconduct, in that they summoned and remained closeted with a deputy clerk of the trial court during their deliberations.

After hearing argument, this Court was promptly and completely satisfied that there was no merit in any of the four grounds first above mentioned. As respects the remaining ground, because of its unusual character and because it directly touches the integrity of jury trial procedure in this Court, the hearing was extended, and the Court on its own initiative, took the testimony of the foreman of the jury that had sat in the case, and also of the deputy clerk, the conduct of both of whom, two of the defendants alleged had been irregular as above set forth. This testimony was taken over the objection of counsel for two of the defendants.

As just stated, this contention of irregularity in the juryroom is a serious one. As presented, it raises two questions: first, whether this Court erred in taking the testimony of the foreman of the jury for the purpose of ascertaining if any irregularity did, in fact, occur; and second, if it did occur, whether it was of such a nature as to require, in the interest of proper, impartial administration of justice, that the verdict be set aside and a new trial be granted.

As respects the first question, namely, whether this Court erred in taking the testimony of the foreman of the jury for the purpose of ascertaining the actual facts, so that this Court might be in the best possible position to determine whet'er there was any sound basis for granting a new trial, we are satisfied that the taking of this testimony was entirely proper.

The principle is well settled that, generally speaking, testimony of jurors will not be received either to impeach or to support their verdict; that is, to dis-

close matters which essentially inhere in the verdict itself and are not capable of contradiction or corroboration. However, this principle has the very important qualification that juror's testimony may be received if it relates to extraneous influences brought to bear upon jurors. That is, they may show by their testimony what the extraneous influence was, and whether it was in fact, or was of a nature calculated to be, prejudicial. United States v. Reid, 12 How. 361, 13 L.Ed. 1023; Mattox v. United States, 146 U.S. 140, 13 S.Ct. 50, 36 L.Ed. 917; Hyde v. United States, 225 U.S. 347, 32 S.Ct. 793, 56 L.Ed. 1114, Ann. Cas.1914A, 614; McDonald v. Pless, 238 U.S. 264, 35 S.Ct. 783, 59 L.Ed. 1300; Clark v. United States, 289 U.S. 1, 53 S.Ct. 465, 77 L.Ed. 993; Bateman v. Donovan, 9 Cir., 131 F.2d 759; Wheaton v. United States, 8 Cir., 133 F.2d 522; United States v. Compagna, 2 Cir., 146 F.2d 524; Charlton v. Kelly, 9 Cir., 156 F. 433, 13 Ann.Cas. 518; Jorgensen v. York Ice & Machinery Corp., 2 Cir., 160 F.2d 432.

In McDonald v. Pless, supra, a leading authority on the question now before us, the defendant had moved to set aside a verdict obtained against him by plaintiffs, attorneys at law, for legal services, on the ground that the jury, at the suggestion of its foreman, rendered a so-called "quotient" verdict, that is, the aggregrate of the amounts each individual juror thought the plaintiffs should be awarded was divided by twelve, and the resultant quotient was returned as the amount of their verdict.

The motion for a new trial further alleged that the jurors had refused to file an affidavit, but stated that they were willing to testify to the foregoing facts alleged in the motion, provided the Court deemed it proper for them to do so. At the hearing on the motion, one of the jurors was sworn as a witness, but the trial court refused to allow him to testify on the ground that he was incompetent to impeach his own verdict.

This ruling was affirmed by both the Court of Appeals for this, the Fourth Circuit (206 F. 263), and the Supreme Court. The latter's opinion, by Mr. Justice Lamar, contains the following, after an explanation that the Conformity Act, 28 U. S.C.A. § 724, does not apply to the power of a federal court to inquire into the conduct of jurors, and we quote at some length because, although the alleged irregularity involved in that case was entirely different, since it was inherent in the verdict itself, the Supreme Court's opinion succinctly states the general rule and the exception to it, which we believe applies in the present case:

"If the facts were as stated in the affidavit, the jury adopted an arbitrary and unjust method in arriving at their verdict, and the defendant ought to have had relief, if the facts could have been proved by witnesses who were competent to testify in a proceeding to set aside the verdict. But let it once be established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding. Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict. If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation; to the destruction of all frankness and freedom of discussion and conference.

"The rule on the subject has varied. Prior to 1785 a juror's testimony in such cases was sometimes received, though always with great caution. In that year Lord Mansfield, in Vaise v. Delaval, I.T.R. 11, refused to receive the affidavit of jurors to prove that their verdict had been made by lot. That ruling soon came to be almost universally followed in England and in this country. Subsequently, by statute in some states, and by decisions in a few others, the juror's affidavit as to an overt act of misconduct, which was capable of being controverted by other jurors, was made admissible. And, of course, the argument in favor of receiving such evidence is not only very strong, but unanswerable— when looked at solely from the standpoint of the private party who has been wronged

by such misconduct. The argument, however, has not been sufficiently convincing to induce legislatures generally to repeal or to modify the rule. For, while it may often exclude the only possible evidence of misconduct, a change in the rule 'would open the door to the most pernicious arts and tampering with jurors.' 'The practice would be replete with dangerous consequences.' 'It would lead to the grossest fraud and abuse' and 'no verdict would be safe.' Cluggage v. Swan, 4 Bin.. [Pa.], [150], 155, 5 Am.Dec. 400; Straker v. Graham, 4 Mees. & W. 721: * * *

"There are only three instances in which the subject has been before this court. In United States v. Reid, 12 How. 361, 366, 13 L.Ed. 1023, 1025, the question, though raised, was not decided because not necessary for the determination of the case. In Mattox v. United States, 146 U.S. 140, 148, 13 S.Ct. 50, 36 L.Ed. 917, 920, such evidence was received to show that newspaper comments on a pending capital case had been read by the jurors. *Both of those decisions recognize that it would not be safe to lay down any inflexible rule because there might be instances in which such testimony of the juror could not be excluded without 'violating the plainest principles of justice.' This might occur in the gravest and most important cases; and without attempting to define the exceptions, or to determine how far such evidence might be received by the judge on his own motion, it is safe to say that there is nothing in the nature of the present case warranting a departure from what is unquestionably the general rule, that the losing party cannot, in order to secure a new trial, use the testimony of jurors to impeach their verdict. The principle was recognized and applied in Hyde v. United States, 225 U.S. 347, 32 S.Ct. 793, 56 L.Ed. 1114, Ann.Cas.1914A 614, which, notwithstanding an alleged difference in the facts, is applicable here.*

*"The suggestion that, if this be the true rule, then jurors could not be witnesses in criminal cases, or in contempt proceedings brought to punish the wrongdoers, is without foundation. For the principle is limited to those instances in which a private party seeks to use a juror as a witness to impeach the verdict."* 238 U.S. 264, at pages 267-269, 35 S.Ct. 783 at page 784, 59 L.Ed. 1300, (Emphasis inserted.)

In Mattox v. United States, 146 U.S. 140, 13 S.Ct. 50, 36 L.Ed. 917, a decision referred to in the part just quoted from the opinion in McDonald v. Pless, the defendant, who had been convicted of murder, had moved for a new trial. In support of his motion, he offered the affidavits of two of the jurors that the bailiff in charge of the jury, after the cause had been heard and submitted, and while the jurors were still deliberating upon their verdict, made certain statements prejudicial to the defendant, in the presence and hearing of the other members of the jury. Additional affidavits of eight of the jurors were offered to the effect that while the jury was still deliberating upon their verdict, a local newspaper was introduced into the juryroom and an article therefrom was read to them which was prejudicial to the accused. The trial court refused to receive and consider any of these affidavits. The Supreme Court reversed this ruling and said as follows, after quoting from United States v. Reid, supra (Mattox v. United States, 146 U.S. 140, at pages 148-151, 13 S.Ct. 50, at page 52, 36 L.Ed. 917):
"The opinion [in that case] thus indicates that public policy, which forbids the reception of the affidavits, depositions, or sworn statements of jurors to impeach their verdicts, may, in the interest of justice, create an exception to its own rule, while at the same time the necessity of great caution in the use of such evidence is enforced.

"There is, however, a recognized distinction between what may and what may not be established by the testimony of jurors to set aside a verdict.

* * * * * *

"The subject was much considered by Mr. Justice Gray, then a member of the supreme judicial court of Massachusetts, in Woodward v. Leavitt, 107 Mass. 453 [9 Am.Rep. 49], where numerous authorities were referred to and applied, and the conclusions announced 'that, on a motion for a new trial on the ground of bias on the part of one of the jurors, the evidence of jurors, as to the motives and influences which affected their deliberations, is inadmissible either to impeach or to support the verdict. But a juryman may testify to any facts

bearing upon the question of the existence of any extraneous influence, although not as to how far that influence operated upon his mind. So a juryman may testify in denial or explanation of acts or declarations outside of the juryroom, where evidence of such acts has been given as ground for a new trial.' * * *

"We regard the rule thus laid down as conformable to right reason and sustained by the weight of authority. These affidavits were within the rule, and, being material, their exclusion constitutes reversible error.

    *      *      *      *      *      *

"The jury in the case before us retired to consider of their verdict on the 7th of October, and had not agreed on the morning of the 8th, when the newspaper article was read to them. It is not open to reasonable doubt that the tendency of that article was injurious to the defendant. Statements that the defendant had been tried for his life once before; that the evidence against him was claimed to be very strong by those who had heard all the testimony; that the argument for the prosecution was such that the defendant's friends gave up all hope of any result but conviction; and that it was expected that the deliberations of the jury would not last an hour before they would return a verdict,—could have no other tendency. Nor can it be legitimately contended that the misconduct of the bailiff could have been otherwise than prejudicial. Information that this was the third person Clyde Mattox had killed, coming from the officer in charge, precludes any other conclusion. * * *"

■ It necessarily follows from the aforegoing decisions that this Court, in the present case, not only possessed the authority to receive the testimony which it did, including that of the foreman of the jury, but that under the particular circumstances of the case, it was its duty to hear such testimony. How else could this Court determine the exact facts with respect to the alleged irregularity in the juryroom? Defendants' counsel, by their motions, ask for such determination, and yet, when this Court endeavors to make it with the aid of what should be the most credible testimony because coming from the person most competent to give it, i. e., the foreman himself of the jury, defendants' counsel say such evidence should not be received. Having thus taken contradictory positions, they seek to escape the resultant dilemma by maintaining that the mere crossing of the threshold of the juryroom by any person while the jury is confined there, requires, without more, the granting of a new trial, even though such person may have remained in the juryroom only momentarily and been entirely passive and mute while there.

In support of this contention, defendants' counsel cite the oath that the bailiff is required to take when he assumes custody of the jury. This oath is as follows: "In the presence of Almighty God, you do, solemnly promise and declare that you shall well and truly keep this jury together in some convenient room; and you shall not suffer any person to speak to them, without leave of the court." Thus, although defendants' counsel did not formally object to the Court's hearing the testimony of the deputy clerk as well as that of the jury foreman, they have maintained, nevertheless, that it is necessary for them to show, for the purposes of establishing their clients' right to a new trial, no more than that the deputy clerk did enter the juryroom while the jury were still confined there, which is conceded.

In Wheaton v. United States, supra, a decision of the Circuit Court of Appeals for the Eighth Circuit in a criminal proceeding, the Government had admitted that a communication between a bailiff and a jury had taken place but offered no proof other than the affidavit of the bailiff, as to the harmlessness of the communication. On this evidence the trial court ruled that no prejudice to the defendant had resulted and denied a motion for a new trial. However, the appellate court decided that this was an abuse of the trial court's discretion, vacated the judgment entered on the verdict, and remanded the case to the District Court with direction to rehear the motion. The higher Court said (133 F.2d 522, at page 527):

"The law is that communications, relative to a case on trial, between jurors and third

persons, or witnesses, or the officer in charge of the jury, are absolutely forbidden, and, if it appears that such communications have taken place, a presumption arises that they were prejudicial, but this presumption may be rebutted by evidence showing the communications to have been harmless.

\* \* \* \* \* \*

"In the instant case, there was no trial of the issues, but merely a submission of the motion upon affidavits, and the only basis for the court's denial of the appellant's motion is the affidavit of the bailiff, with such corroboration as is found in some of the jurors' affidavits submitted by the appellant. The Government, having admitted that a communication between the bailiff and the jury had taken place, had the burden of establishing by competent evidence that the communication was in fact harmless. The affidavit of the bailiff was not competent proof that the communication was harmless, and was not a sufficient basis for the determination of the trial court that no prejudice had resulted. We think that the denial of the motion was under the circumstances, an abuse of discretion.

"The motion and affidavits presented by the appellant cast suspicion upon the fairness of the trial. If the truth is that the challenged conduct of the bailiff was or may have been prejudicial, a new trial should be granted. On the other hand, if the bailiff only repeated to the jury what the jury had already been told six times by the court, the Government should not be subjected to the trouble and expense of retrying this case.

"The issues arising upon the motion for a new trial have not yet been competently tried. It is apparent that the parties and the trial court did not realize the necessity of having evidence adduced. We think that, under the circumstances, this Court would not be justified in reversing the judgment and ordering the district court to grant a new trial. To afford that court an opportunity to exercise a proper discretion, it is ordered that the judgment entered upon the verdict of the jury be vacated and that the cause be remanded to the district court with directions to set aside the order denying a new trial, to rehear the appellant's motion, and, after a rehearing, to determine whether a new trial should be granted, or whether it should be denied and judgment re-entered upon the verdict."

We understand the aforegoing opinion to mean that the trial court should take the testimony of the foreman, or other members of the jury if found necessary in order to arrive at the exact facts.

In Jorgensen v. York Ice Machinery Corp., supra, a very recent decision of the Circuit Court of Appeals for the Second Circuit, which was a personal injury suit, there was a motion for a new trial based upon the alleged misconduct of the jury, as appeared from the affidavit of the foreman, which was in substance as follows: On the morning of the last day of the trial, the foreman had received word that his son had been killed in action. He applied to the clerk of the court to have the trial postponed for a day, but was told that this could not be done. Neither counsel nor the court learned of the foreman's affliction; the case was concluded and the jury sent out. The other members of the jury then learned of the foreman's bereavement, and of his natural desire to rejoin his family as soon as possible. The jury was divided, and since they thought it likely there would be a deadlock, one or more of them wished to announce to court their inability to agree. However, since the others thought that this would only result in their being sent back, it was suggested that since seven were for the defendant and five for the plaintiff, they should return a verdict for the defendant. This they did. The foreman's affidavit also declared that he was much upset mentally at the time; that he thought the plaintiff should have a verdict, and that he consented to a contrary verdict because impelled by the necessity to return home as soon as possible.

The trial judge ruled that the jury foreman's affidavit contained nothing which would justify setting aside the verdict. The plaintiff appealed from the adverse judgment and also brought up the trial court's order denying his motion for a new trial, because of the alleged misconduct of the jury. On this latter question, the court said (160 F.2d 432, at page 435): "There remains the only question on the appeal which has any substance: the order deny-

ing a new trial because of the supposed misconduct of the jury. Such an order, though discretionary, is indeed at times appealable, although the occasions are extremely rare. The whole subject has been obscured, apparently beyond hope of clarification, by Lord Mansfield's often quoted language in Vaise v. Delaval, that no evidence of misconduct was competent which came from the jurors themselves, although, as judges have repeatedly pointed out, it is impossible to see from what source better evidence could be obtained. On the other hand, it would be impracticable to impose the counsel of absolute perfection that no verdict shall stand, unless every juror has been entirely without bias, and has based his vote only upon evidence he has heard in court. It is doubtful whether more than one in a hundred verdicts would stand such a test; and although absolute justice may require as much, the impossibility of achieving it has induced judges to take a middle course, for they have recognized that the institution could not otherwise survive; they would become Penelopes, forever engaged in unravelling the webs they wove. Like much else in human affairs, its defects are so deeply enmeshed in the system that wholly to disentangle them would quite kill it. The discussion of Lamar, J., in McDonald v. Pless, supra, well states the necessary compromise and that of Cardozo, J., in Clark v. United States, is akin, although the point decided was different.

"All this has, however, nothing to do with what evidence shall be competent to prove the facts when the facts do require the verdict to be set aside, as concededly some facts do. The two decisions of the Supreme Court which we have cited, as well as its approach in United States v. Reid and Hyde v. United States, suggest it as not improbable that when the question arises in the future, the testimony of the jurors may be held competent, and that we shall no longer hear that they may not 'impeach their verdict,' when it is 'impeachable' if what they say is true. Maybe not; judges again and again repeat the consecrated rubric which has so confused the subject; it offers an easy escape from embarrassing choices. In the case at bar at any rate we shall not dispose of the appeal in that way; we shall accept what the affidavits said, as did the judge, and like him we shall decide whether it required the relief asked. * * *"

The court concluded that the lower court's refusal to grant plaintiff's motion for a new trial should be affirmed.

The analysis which we have given of the leading cases is believed to be sufficient, without reviewing any additional cases, to show conclusively that this Court's acceptance and consideration of the testimony of the foreman of the jury, and of the deputy clerk, were in entire conformity with those decisions and were, in fact, a sine qua non of any rational approach to a determination of the circumstances as they actually occurred in the jury room. Therefore, we now turn to a consideration of those circumstances as disclosed by the testimony which was heard.

It should be pointed out that, for the reason already explained, no effort whatsoever was made on behalf of defendants to refute the testimony of either the jury foreman or the deputy clerk, except through unsworn statements of defendants' counsel that they had personally seen the deputy clerk enter the juryroom, and that he was timed while there and was found to have remained five minutes.

First, the pertinent parts of the testimony of Mr. Gordon, foreman of the jury, may be summarized as follows: The jury had reached its verdict before the entrance of the deputy clerk into the juryroom which was done at the foreman's request, relayed through the bailiff who had custody of the jury and was on duty at the door of their room. The only reason the foreman wanted to speak to the deputy clerk was because he was confused by the style of the case which was "Liggett & Myers Tobacco Company, Inc., a body corporate, to its own use and to the use of Atlas Assurance Company, Ltd." v. the defendants, and the foreman wanted to know the proper form in which to announce the jury's verdict.

When the foreman addressed the bailiff outside of the juryroom and asked him to get the deputy clerk, the bailiff asked the foreman whether the jury had reached a verdict and he replied: "We have but be-

fore we go in there, I would very much like to see the clerk if I can."

When the deputy clerk knocked on the door of the juryroom, the foreman advised him likewise that the jury had reached a verdict, and that what the foreman wanted to be advised about was how to refer to the plaintiff in announcing the jury's verdict; that is, whether the foreman was required to state the names of the various plaintiffs. The foreman also asked the deputy clerk whether the jury should itself calculate any interest to be allowed in rendering a verdict for the plaintiff. To this inquiry, the deputy clerk replied: "Well, that is up to you gentlemen." In reply to the question by the Court as to whether he recalled how long the deputy clerk remained in the juryroom, the foreman replied: "I would say two or three minutes. I would say not over that. It certainly does not seem that long. I had the verdict written out on a piece of paper and I wanted to make sure I had it written that way."

Just prior to making the aforegoing statement, the foreman had testified that he would like to apologize to the Court for doing what he did, that he thought it was perfectly all right to do it. He reaffirmed his earlier testimony to the effect that "There was nothing about the case discussed at all. All I wanted was to get the wording of the verdict."

When asked by counsel for one of the defendants, who had raised the question now under consideration, whether he had inquired of the deputy clerk while the latter was in the juryroom whether the jury should find any of the defendants guilty or not guilty, the foreman replied in the negative. When further asked whether he heard the deputy clerk have any conversation with any other member of the jury, the foreman replied as follows: "No sir, he did not. He talked to me. He stood here [indicating]. I was at the head of the table. He stood right by me. We both talked in voices so that everybody in the room could hear; but he did not talk to anybody but me."

Upon being asked by the Court whether he recalled how long it was after the deputy clerk had left the juryroom that he, the foreman, told the bailiff that the jury was ready to render its verdict, the foreman replied: "I told him, I think, at the time Mr. Janne [the deputy clerk] left the room, that we were ready. He would not let us come back. He said, 'The Judge is not in the courtroom; so you will have to wait.'"

Finally, upon being asked by the court whether he had likewise told the deputy clerk that the jury was ready to bring in its verdict, the witness replied: "Yes. And I had previously told Mr. Janne and Mr. Scott [the bailiff] the same thing. When I first asked for Mr. Janne I told him we had reached our verdict, and I told Mr. Janne that, when he first came to the door, and of course again when he went out that we were ready to come back."

Just as in the case of the foreman of the jury, the deputy clerk took the stand at the request of the Court. His testimony, summarized, was as follows: He stated that he had been at the Judge's chambers waiting for the jury to agree on its verdict and decided to walk out into the corridor, where he was approached by the bailiff who told him that the foreman of the jury wanted to see him for a minute. Thereupon he went to the door of the juryroom and thereafter, what occurred was exactly as the foreman had testified, with the additional circumstance that some member of the jury, if not the foreman then some other member sitting close to the foreman, whom he could not now identify, asked him whether or not the jury could bring in a verdict of guilty of conversion and not guilty of conspiracy. To this the deputy clerk replied that the case was a civil and not a criminal one, and that the jury's function was to find either for plaintiff or for the defendants.

Upon being asked by the Court whether he had a definite recollection as to how long he had remained in the juryroom, the deputy clerk stated not more than a minute and a half or two minutes. "I personally don't think it was more than two minutes at the most, and I say, too, that it comes back clearly now that the jury foreman said 'well we are ready to come in.'"

In considering the first question which we have to decide, namely, whether there was error in the Court taking the testimony of the foreman of the jury, and in explain-

ing the reasons for our conclusion that this question must be answered in the negative, we believe that we have also clearly indicated, from our rather lengthy review of the decisions bearing upon this first question, what also is the true rule that must guide us in deciding the second question now under consideration.

Most, if not all, of the cases to which we have already referred deal, in the very nature of things, with both questions. However, we will restate the principle that must control us as follows: Once a jury has retired to its room to deliberate upon its verdict, nothing further should reach it in any form whatsoever unless by order of the Court, in strict conformity with established jury trial procedure. Therefore, any lapse or departure from this rigid rule must be closely scrutinized. However, if the irregularity complained of is shown, with certainty, to have been very trivial or slight and not proved to have influenced, or to have been of such character that it would be reasonable to presume that it might influence the jury in any respect, such is not to be considered as a sufficient departure from procedural regularity as to be ground for a new trial. As indicated by the decisions which we have already analyzed or cited in the first part of this opinion, the rule has more often been put to the test in criminal than in civil proceedings, for obvious reasons. However, since this rule is firmly established with respect to jury trials in criminal causes, a fortiori, at least no more inflexible rule should be held reasonable in civil causes tried before juries.

Tested by the rule just stated, we are satisfied that what transpired in the juryroom, of which two of the present defendants complain, was in no sense prejudicial to any of them, because entirely devoid of any proven influence or the probability of same upon the jury's deliberations or verdict. Therefore, no sufficient ground for granting a new trial has been shown.

We believe that this conclusion is amply supported by numerous decisions. As early as 1851, in United States v. Reid, supra, Mr. Chief Justice Taney decided that the affidavits of two jurors to the effect that, while impanelled, they read a newspaper report of the preceding evidence but which had no influence upon their verdict, were not sufficient ground for a new trial. The Chief Justice stated that it was unnecessary to lay down a general rule upon the subject of the conditions under which affidavits of jurors impeaching their verdict ought to be received, "because we are of opinion that the facts proved by the jurors, if proved by unquestioned testimony, would be no ground for a new trial. There was nothing in the newspapers calculated to influence their decision and both of them swear that these papers had not the slightest influence on their verdict." 12 How. 361, at page 366, 13 L.Ed. 1023.

In Charlton v. Kelly, supra, a decision of the Circuit Court of Appeals, Ninth Circuit, the following facts were made the basis for a motion for a new trial in an ejectment proceeding: After the case had been submitted to the jury and they had been in deliberation some twenty hours, they notified the bailiff in charge of them that they could not reach an agreement, and requested him so to notify the judge. The bailiff communicated this request to the marshal. He thereupon went to the juryroom, spoke to the jury about their inability to agree, and suggested that they get further instructions from the judge. It was also proven through affidavits of the jurors that the marshal remarked to them that the case was an important one, that it was being tried for a second time, and that they ought to be able to agree. At that time, they stood evenly divided. Thereafter, they were brought into court and were further instructed. They again retired and agreed upon a verdict.

The court overruled the motion for a new trial, and in affirming this ruling, the appellate court said (156 F. 433, at pages 438, 439):

"If an officer of the court, whether he has charge of the jury or not, makes to the jury during their deliberations statements calculated to influence their verdict, it is ground for a new trial. Mattox v. United States, 146 U.S. 140, 13 S.Ct. 50, 36 L.Ed. 917; State v. La Grange, 99 Iowa 10, 68 N.W. 557; State v. Dallas, 35 La.Ann. 899; Barnett v. Eaton, 62 Miss. 768. But if,

under all the circumstances, it does not appear that the conduct of the officer had the effect of influencing the verdict, a new trial will not be ordered upon that ground. United States v. Reid et al., 12 How. 361, 13 L.Ed. 1023; Leach v. Wilbur, 9 Allen, Mass., 212; State v. Wart, 51 Iowa 587, 2 N.W. 405; Nelling v. Industrial Mfg. Co., 78 Ga. 260. The affidavits concerning the nature of the remarks of the marshal to the jury are to some extent contradictory. Conceding the facts to have been as presented most strongly for the plaintiffs in error, they are that the marshal said:

" 'What is the matter with you that you can't agree in this case? This is a very important case, and this is the second time it has been tried. You ought to be able to come to some agreement some way. You had better call up the judge and get some more instructions.'

"There is nothing in the affidavits to show that any of the jurors was influenced by these remarks, and there is nothing in the language shown calculated to influence the jury for one or the other of the parties. While such remarks by an officer of the court to a jury are prohibited by law, and should be discountenanced, they are not necessarily ground for a new trial, and they are certainly not ground for the reversal of a judgment in an appellate court after the trial court has passed upon their force and effect on a motion for a new trial."

In Colt v. United States, 190 F. 305, decided by the Circuit Court of Appeals, Eighth Circuit, which involved a prosecution for using the mails in furtherance of a scheme to defraud, it was shown by affidavits of the bailiff in charge of the jury that late in the evening, after the case had been submitted to it, a member of the jury rapped upon the door. The bailiff opened it, one of the jurors came out and said that the jury wanted a copy of the federal statutes. Thereupon the bailiff procured the same, took it into the juryroom and placed it on a table before the jury. About an hour afterward, the jury reached a verdict.

The trial court refused to grant a motion for a new trial, and the appellate court, in affirming, said (190 F. 310): "The conduct of the jury in the case before us was quite improper, and, if its verdict was influenced because thereof, it should not be permitted to stand. But we are convinced that the verdict was not in the least influenced by the alleged misconduct. What volume of the 'federal statutes' was taken to the jury room is not shown. If it may be presumed (which we do not intimate that it may be) that it was a copy of the Revised Statutes of the United States, or some other volume containing the section as amended upon which the indictment is based, and that the jury read the same, it obtained no other information than what the court had given it in its charge, for in that the court read the section in full and explained its meaning. It is not shown that any one connected with the prosecution caused the volume to be delivered to the jury. There is an entire absence of any showing that the verdict was influenced by the incident; and it is only urged in support of the assignment that the jury may have formed some erroneous impression of the law from reading the statute. If verdicts are to be set aside by the appellate courts for such reasons, few indeed will stand. But we are of opinion that, before a verdict can rightly be disturbed because of misconduct of the jury in reading papers or books not in evidence, it must be made to appear that the jury was influenced in arriving at the verdict by what they read, or that it was such that it would be presumed to have influenced the verdict. It is not so shown in this case, and such presumption cannot rightly be indulged from the facts shown. There was no error, therefore, in denying the motion for new trial."

United States v. Campagna, supra, a fairly recent decision of the Circuit Court of Appeals, Second Circuit, involved the conviction of several persons of conspiracy to obtain money by coercion in interference with interstate commerce, in violation of Title 18 U.S.C.A. §§ 420a, 420d. One of the alleged errors was that the Judge had spoken to the jury, out of court, after they had retired.

It appears from Circuit Judge Learned Hand's opinion in this case that after the jury had been locked up, they sent out a note asking that certain testimony adduced

at the trial should be read to them; that the judge on his way back to the courtroom stopped in the juryroom, asked the jury what they wanted to have read to them, and then told them they could go to lunch and that the testimony would be got ready and presented to them when they came back. This testimony was read to them upon their return, exclusive, however, of the cross-examination which the jury, apparently did not desire to hear.

With respect to the visit of the judge to the juryroom, the appellate court said (146 F.2d 524, at page 528): "It is true that courts are extremely jealous of anything of the kind, once the jury had been locked up; and we do not wish to abate that jealousy in the least; it is most undesirable that anything should reach a jury which does not do so in the courtroom. This is, indeed, too well settled for debate. * * * But, like other rules for the conduct of trials, it is not an end in itself; and, while lapses should be closely scrutinized, when it appears with certainty that no harm has been done, it would be the merest pedantry to insist upon procedural regularity. * * * There cannot be the slightest doubt here that the informality—for, at most, it was no more—did not prejudice the accused."

The facts in the aforegoing case are, of course, clearly distinguishable from those in Fillippon v. Albion Vein Slate. Co., 250 U.S. 76, 39 S.Ct. 435, 63 L.Ed. 853. There, in response to an inquiry from the jury who had retired to deliberate upon their verdict, the trial judge sent them a supplementary instruction in writing on the question of contributory negligence. The Supreme Court held this to have been error, the parties and their counsel being absent and no opportunity given them either to be present or to make timely objection. See also Dodge v. United States, 2 Cir., 258 F. 300; Little v. United States, 10 Cir., 73 F.2d 861.

■ If it be asserted that Rule 43 (a) of the Federal Rules of Civil Procedure, 28 U.S.C.A. following Section 723c, requires—which, however, we do not believe to be the case—an adherence to local State Court procedure, in a matter of this kind, not previously required (see McDonald v. Pless,

supra, and what, as we show, the Supreme Court there decided with respect to conformity), suffice it to say that the conclusion which we reach, both with respect to the competency of a juror's testimony in the present case and the lack of sufficient ground for granting a new trial, is also in conformity with Maryland law. See note to Bosley v. Chesapeake Ins. Co., 3 Gill & J., Md., 450, 473, 22 Am.Dec. 337; Browne v. Browne, 22 Md. 103, 104; Brinsfield v. Howeth, 110 Md. 520, 73 A. 289; Rent-A-Car Co. v. Globe & Rutgers Fire Ins. Co., 163 Md. 401, 163 A. 702, 86 A.L.R. 922. It is likewise in conformity with the law of numerous other States.

■ While we do not rest our decision on waiver, because obviously under certain circumstances it might be unfair to a party litigant to rule that he was bound by some dereliction of his attorney for which he was in no sense responsible and of which he had no knowledge, nevertheless we cannot blink the fact that counsel in the present case failed to report the irregularity to the Court, as they should have done, as soon as they become aware of it and before the Court took the jury's verdict. Had this been done, the Court should and would have made an immediate, thorough investigation of the complaint before the jury's verdict was rendered. This failure on the part of attorneys for two of the defendants who alone have made an issue of the irregularity, gives much force to the presumption that these attorneys decided to call the Court's attention to what had occurred solely because of their surprise and disappointment over the verdict and its amount.

In saying this it should be understood that we have not lost sight of the fact that counsel for one of the defendants did acquaint the Court verbally, a day or two following the verdict and before any formal motions for a new trial were filed, with what he intended to do in this respect on behalf of his client. We do not think this completely satisfied counsel's professional obligation under the circumstances. None of the attorneys who knew of the irregularity complained of before the jury returned to the courtroom to render its verdict should have made their disclosure to the Court dependent upon the character of the verdict.

In Brawner v. Hooper, 151 Md. 579, 135 A. 420, it was held that a party to a suit with whom a juror had improperly communicated, cannot reserve his complaint of such misconduct until after a verdict against him. There, a damage suit, after the conclusion of the case but before the jury had retired to consider their verdict, appellant was approached by one of the jurors who happened, apparently by accident, to be near him. The juror asked him where the person was who was driving appellant's car at the time of the accident, but who had not been called as a witness by either side. Appellant replied that he did not know. Nothing was said to the court about the incident until after the jury had returned their verdict and judgment thereon had been entered. Then appellant filed a motion to strike out the judgment on the ground that the conduct of the juror had irreparably injured him. The Court of Appeals sustained the lower court in overruling the motion and said (151 Md. at page 594, 135 A. at page 426): "It is not apparent how appellant could have been injured by the conduct of the juror of which he complains; in fact it tended rather to help than hurt him, for the jury of course knew that the chauffeur had not been called, but they did not know why, and the juror's question gave appellant an opportunity to explain that, because if he did not know where the witness was that would be some excuse for not calling him. But whether it injured him or not, it was too late for him to complain of it after the jury had returned their verdict. He could not keep to himself the knowledge that one of the jurors had been guilty of misconduct sufficient to disqualify him until he found out whether the verdict was for or against him, and complain for the first time when it was against him. Poe, Practice, § 348A; 35 C.J. 404½."

To the same effect is Lynch v. Mayor and City Council of Baltimore, 169 Md. 623, 182 A. 582. While, as already stated, we do not rest our decision on the principle of waiver announced is these cases, we, nevertheless, recognize that there is much force in that principle as applied to the circumstances in the present case.

We believe that no further discussion of the controlling principle, or of any additional decisions that have applied this principle, is necessary in order to make clear the reasons for our conclusion in the present case that no sufficient ground for granting a new trial has been shown. First, there is nothing to indicate that the foreman of the jury was telling other than the truth when he testified that the jury had already reached an agreement, before the deputy clerk entered their room, as to their verdict as actually rendered; and second, there is absolutely no reasonable ground for the slightest presumption that the jury's verdict, as rendered, could have been influenced by the circumstances complained of. The verdict was already an accomplished fact. There is nothing to indicate that anything which the deputy clerk said, or did, affected the verdict, either as respects parties or amount.

As we have herein shown by a complete summary of the deputy clerk's testimony, as well as by that of the foreman of the jury, their statements coincided in every particular except one, and this we believe to be of minor importance. We refer to the fact that the deputy clerk made the additional statement that some member of the jury, but one whom he could not identify, asked him something about whether there could be a finding of guilt on the part of defendants with respect to conversion, and not with respect to conspiracy. The deputy clerk stated that he gave the jury no information on this point whatsoever, except to remind them that they were sitting in a civil, not a criminal case, and that the question was not one of guilt or innocence, but the right on the part of the plaintiffs to obtain, or not to obtain, a monetary verdict.

There is nothing to raise the slightest presumption of any collusion between the foreman of the jury and the deputy clerk, or that they were not both endeavoring to tell the true story with respect to the circumstances in question, according to the best of their individual recollections. It is true that both the foreman of the jury and the deputy clerk should not have done what they did. Both should have adhered to the instructions which the Court thought

had been made clear to the members of each succeeding jury panel, including this one, and also to deputy clerks and to bailiffs that any inquiries or requests coming from the juryroom, once the jury has been confined there for the purpose of deliberating upon their verdict, should be set down in writing, signed by the foreman and presented to the bailiff in charge of the jury. He, in turn, has no other authority than to act as a conduit to relay the jury's message through the clerk, a deputy clerk or another bailiff, forthwith to the judge for appropriate action by him. It is true that *any* departure from these very formal, strict requirements has a tendency to lessen respect for the administration of justice, and the dignity that should surround jury trials. However, assuming that such may have been the effect of the minor transgression here complained of, and however much such possible effect is to be deplored, it is not to be confused with the question we are here called upon to determine, namely, whether such transgression was in fact, or was of such a character as likely to be, prejudicial to any of the parties in this present case. We are satisfied that it was not. Accordingly, the defendants' motions for a new trial must be dismissed.