Ralph L. DISTAD, Administrator of the Estate of Mary J. Poulin, Deceased, Appellant (Plaintiff),

v.

Frederick W. CUBIN, M. D., and Memorial Hospital of Natrona County, Casper, Wyoming, Appellees (Defendants).

No. 5414.

Supreme Court of Wyoming.

Sept. 1, 1981.

P. Richard Meyer, and Robert N. Williams, Spence, Moriarity & Schuster, Jackson, signed the brief on behalf of appellant; and P. Richard Meyer, Jackson, appeared in oral argument.

J. E. Vlastos, Vlastos, Reeves & Murdock, Casper, signed the brief on behalf of appellee Cubin. R. R. Bostwick, Murane & Bostwick, Casper, signed the brief on behalf of Memorial Hospital. J. E. Vlastos and R. R. Bostwick Casper appeared in oral argument.

Before RAPER, THOMAS, ROONEY and BROWN, JJ., and JOHNSON, District Judge.

RAPER, Justice.

Appellant, as administrator, filed this wrongful death action against appellees contending that they had been negligent in their medical treatment of Mary Poulin, deceased. On appeal, he raises four issues. First, he contends the district court erred in allowing each defendant three peremptory challenges to the jury. His position is that the defendants together should have had only three such challenges. Second, appellant claims that if a defendant is shown to have failed to comply with state and federal regulations, then he/she/it should be held to have been negligent per se. Thus, appellant insists that the district court erred in refusing to so instruct the jury. Third, appellant asserts that the uncontradicted evidence demonstrated that there was a violation of public health regulations and thus the jury's failure to ascribe any negligence to the defendants is as a matter of law erroneous. Finally, he argues that it was error in this case for the trial judge to refuse to grant a new trial where there was evidence that a juror had some contact with a prospective witness.

We will affirm.

I

Ralph L. Distad (appellant) as the administrator of the estate of Mary J. Poulin, filed suit against Frederick Cubin, M.D. (Dr. Cubin) and Memorial Hospital of Natrona County (Hospital)—appellees—on December 16, 1974. In his first cause of action appellant charged that Dr. Cubin had been negligent in treating Mary Poulin and that said negligence was a proximate cause of

her death. In his second cause of action appellant accused the Hospital of negligently treating Ms. Poulin and that the Hospital's negligence through its servants was also a proximate cause of her death.

The suit's underlying event occurred on June 11, 1973. On that day at about 6:55 p.m. Ms. Poulin entered the Hospital's emergency room. The complaint was made that she had been trying to get a doctor to treat her, but since she was on welfare, all the doctors had refused. When asked what specifically was wrong, Ms. Poulin indicated that she was overweight and had been not only unable to reduce but was in fact gaining. Ms. Poulin, who stood approximately five feet tall, told the nurse on duty that she weighed 268 pounds. Dr. Cubin, who was taking the emergency room's calls that evening, was advised by the nurse of the presence of Ms. Poulin in the emergency room as well as the nature of her complaint. When Dr. Cubin was reassured that the woman's only complaint was obesity, he arranged to see Ms. Poulin the next morning. Shortly thereafter Ms. Poulin left the hospital; during the night she died of pulmonary edema congestive heart failure which was a product of her obesity.

The case went to trial on June 2, 1980. The jury returned a verdict on June 18, 1980, finding both defendants free of any negligence whatsoever.[1]

## II

The first issue we will address concerns peremptory challenges to prospective jurors. In this case, prior to the commencement of the voir dire examination of the prospective jurors, the court met in chambers with the parties' counsel. It was decided there that Dr. Cubin, the Hospital, and appellant, would each have three peremptory challenges to the jury panel. Appellant's first expression of dissatisfaction with this ruling, which appears on the record, occurred during the noon recess after voir dire had begun. He further objected

when it was apparent the court was permitting three peremptories for each defendant. A final objection was made when the panel of jurors not selected was excused. Now on appeal, appellant again asserts that it was error for the defendants to have six peremptory challenges between them while he was allowed only three. We must disagree.

The number of peremptory challenges allowed in a civil suit in Wyoming is governed by § 1–11–202, W.S.1977. This statute provides:

"In the trial of civil cases in the district courts of this state, each side is allowed three (3) peremptory challenges."

The question arises from this statute as to what is meant by the term "side." There is no Wyoming case law to guide us in construing that term. Accordingly, we will consider the law of sister states.

The courts of Texas have been faced with a similar question which required the same considerations to be made in resolving it as must be made here.

"Rule 233, Texas Rules of Civil Procedure, provides that each party to a civil suit tried in district court shall be entitled to six peremptory challenges. In *Retail Credit Co. v. Hyman*, Tex.Civ.App., 316 S.W.2d 769 (writ ref.), it was pointed out that the 'word "party", as used in the rule, does not mean the same thing as the word "person". *Hargrave v. Vaughn*, 82 Tex. 347, 18 S.W. 695. The mere fact that there may be multiple parties-defendant does not entitle each person to six peremptory challenges. Whether such defendants are parties within the meaning of Rule 233, so as to be entitled to separate peremptory challenges, depends on whether their interests are, at least in part, antagonistic in a matter that the jury is to be concerned with.' "Parties on the same side of the docket may be entitled to separate peremptory challenges even though no affirmative relief is sought by one against the other. * * * *" *Tamburello v. Welch*, Tex., 392 S.W.2d 114 (1965).

1. The facts of the case will be discussed in further detail when necessary for disposition of the issues.

Further guidance may be found in a recent medical malpractice case from the Court of Appeals of Kentucky. There the plaintiff complained that the trial court had erred in giving the defendants nine peremptory challenges while she got only three. The court held:

"Multiple defendants are entitled to additional peremptory challenges under KRS 29.290 if their interests are antagonistic. At the time the trial commenced on February 20, 1976, cross-claims had been asserted between Drs. Grise and Blackburn on the one hand and Drs. Kirby and Scott on the other. Even more important, the physicians were charged with independent acts of negligence. As the court stated in *Roberts v. Taylor*, Ky., 339 S.W.2d 653, 656 (1960):

" 'Where the defendants in a personal injury action are charged with independent acts of negligence * * * the interests of the defendants are most always antagonistic, because each may escape liability or reduce his liability by convincing the jury that the other was solely or primarily responsible. The assertion of cross-claims for indemnity or contribution will merely formalize the antagonism of interest in this regard.' "

*Mackey v. Greenview Hospital, Inc.*, Ky.App., 587 S.W.2d 249 (1979).

See also, *Johnson v. Superior Court of California, In and For County of Los Angeles*, 50 Cal.2d 693, 329 P.2d 5, 9–10 (1958).

■ We agree with the reasoning of these decisions. We hold that in determining whether multiple defendants constitute one side, consideration must be given the nature of the claim against them and whether the defendants' interests are or may be antagonistic.

■ In this case, appellant sued both defendants on a negligence theory. Separate acts of negligence were attributed to each defendant in the complaint. The hospital's alleged negligence was independent of the doctor's, while the doctor's was independent of the hospital's. Under Wyoming's comparative negligence scheme, the independent negligence of each of the actors as a party is used to reduce the other actor-party's responsibility for the damages. See *Board of County Commissioners of County of Campbell v. Ridenour*, Wyo., 623 P.2d 1174 (1981). Thus, in this case the more negligent the decedent and the hospital were shown to be, the less the doctor's liability could be. The hospital in turn could reduce its liability by showing how much more negligent the decedent and the doctor were. The result of Wyoming's comparative negligence design is that very seldom will multiple defendants not have antagonistic interests. There is here a triangle of parties as actors.

■ Our use of the term "antagonistic" does not mean that parties must express as between them dislike, hatred, unfriendliness, ill-will, or spite; it should be read in accord with our adversary system. The fact that Dr. Cubin and the Hospital were not openly antagonistic during the trial does not change the fact that their interests were conflicting. It only shows that they believed strategically the best way to handle the matter was to show how weak the appellant's case was. Accordingly, we must rule against him and in favor of the district court's action. In deciding who gets peremptory challenges, we will look to see whether the parties' interests are by their nature antagonistic.

### III

■ This court has said rather recently that the duty of care is a question of law to be determined by the court. *Medlock v. Van Wagner*, Wyo., 625 P.2d 207 (1981). It is a standard-fixing function which the judiciary must perform in order to give the jury a direction to decide whether a defendant's conduct in a particular case is justifiable or should be condemned and that if the conduct is found to be at variance with the standard, money is to be taken from the defendant to repair the plaintiff's damage. What are the means by which a court determines a standard of conduct? The Restatement, Torts 2d, § 285 summarizes the methodology:

"The standard of conduct of a reasonable man may be

"(a) established by a legislative enactment or administrative regulation which so provides, or

"(b) adopted by the court from a legislative enactment or an administrative regulation which does not so provide, or

"(c) established by judicial decision, or

"(d) applied to the facts of the case by the trial judge or the jury, if there is no such enactment, regulation, or decision."

In the issue we are about to discuss and dispatch, we are concerned with standards of care borrowed from legislative enactments or administrative rules derived from statutory authority. It is seldom that the legislature provides specifically a standard of conduct which if violated shall entail civil liability in tort, as set out in § 285(a) of the Restatement, supra.[2] We find our cause for concern in the case before us with relation to our standard-making function in § 285(a), supra, described in paragraph (c) of the Restatement's comments in that regard:

"c. *Standard adopted from legislation.* Even where a legislative enactment contains no express provision that its violation shall result in tort liability, and no implication to that effect, the court may, and in certain types of cases customarily will, adopt the requirements of the enactment as the standard of conduct necessary to avoid liability for negligence. The same is true of municipal ordinances and administrative regulations. See § 286 and Comments."

Just how to deal with statutes, ordinances and administrative regulations as standards

2. The Restatement describes this process in paragraph (b) of its comments:

"b. *Standard fixed by legislation.* In any or all of these respects the standard of conduct may be defined and established by a legislative enactment which lays down requirements of conduct, and provides expressly or by implication that a violation shall entail civil liability in tort. In such case the only questions that can arise as to the effect of the statute are as to its constitutionality and construction. If it is constitutional, and the intent to impose civil liability is clear, the court must apply it. Whether the legislative body of a municipality or other subdivision of a

of duty appears to be unsettled in this jurisdiction.

Appellant asserts that the jury was improperly instructed that the failure of a party to comply with a state or federal regulation is evidence of negligence. He contends that the jury should have been told that such a failure constitutes negligence per se, i. e., negligence in itself.

The regulations involved were included in the following instructions:

"INSTRUCTION NO. 18

"At the time of the occurrence the standards, rules and regulations for hospitals and related facilities which were promulgated by the Department of Public Health of the State of Wyoming provided:

"*Section 13.b:* 'Facilities. Facilities shall be provided to assure prompt diagnosis and emergency treatment 24 hours a day.'; and

"*Section 13.c.(3):* 'A physician shall see all patients who arrive for treatment in the emergency service.'; and

"*Section 13.d:* 'Records. Adequate medical records on every patient shall be kept.

" '1. The emergency room record shall contain:

" '(a) Patient identification;

" '(b) History of disease or injury;

" '(c) Physical findings;

" '(d) Laboratory and x-ray reports (if any);

" '(e) Diagnosis;

" '(f) Record of treatment;

" '(g) Disposition of the case;

state has power to define a standard of conduct obligatory between citizens as to tort liability, is a question of public law, and is not within the scope of this Restatement. In so far as there is such power, a municipal ordinance has the same force and effect as a statute enacted by the legislature of a State, or by the Congress. The same is true of the administrative orders and regulations of boards and commissions, within the limitations of their powers, although cases will be comparatively infrequent in which administrative regulations can be construed to have such an effect."

" '(h) Signature of physician.' "

"INSTRUCTION NO. 19

"At the time of the occurrence the United States Department of Health, Education and Welfare Regulations provided: " '405.1032: Condition of Participation—Outpatient Department—Participation is not limited to hospitals which have organized outpatient departments, but if they are present, these are effective policies and procedures relating to the staff, function of the service, and outpatient medical records and adequate facilities in order to assure the health and safety of the patients. * * *

" '(4) Patients, on their initial visit to the department, receive a general medical evaluation and patients under continuous care receive an adequate periodic reevaluation.'; and

"405.1033(c) '(3) A physician shall see all patients who arrive for treatment in the emergency service.'; and

"405.1033 '(d) Standard; Medical Records—Adequate medical records are kept. The factors explaining the standard are as follows:

" '(1) The emergency room record contains:

" '(i) Patient identification;

" '(ii) History of disease or injury;

" '(iii) Physical findings;

" '(iv) Laboratory and x-ray reports, if any;

" '(v) Diagnosis;

" '(vi) Record of treatment;

" '(vii) Disposition of the case;

" '(viii) Signature of a physician. * * ' "

The court then informed the jury in its next instruction:

"Where a rule or regulation is violated the same may be viewed by the jury as evidence of negligence.

"If you determine that a party violated a rule or regulation on the occasion in question, then you may consider that fact together with all the other facts and circumstances in evidence in determining whether or not the party was negligent at the time of the occurrence."

As all of the parties have pointed out, Wyoming case law on the proposition as applied to statutory negligence per se may not be clear. In *Hester v. Coliseum Motor Co.*, 41 Wyo. 345, 285 P. 781 (1930), this court said:

" * * * Violation of traffic regulations, also, whether they be of the state or municipality, are at least evidence of negligence. In 2 Blashfield's Cyclopedia of Automobile Law, 1158, where many cases are cited, it is stated that: 'By the great weight of authority such violation is negligence per se.' [Citation.]"

This court noted the difficulty the Tenth Circuit Court of Appeals had resulting from *Hester*, supra, but was not required to resolve in *Endresen v. Allen*, Wyo., 574 P.2d 1219, 1224 (1978).[3] However that may be, the instruction or the concept has been mentioned in several Wyoming cases. In *Zanetti Bus Lines, Inc. v. Logan*, Wyo., 400 P.2d 482 (1965)[4] the court only noted that

---

3. In *Grayson v. Williams*, 256 F.2d 61, 64–65 (10th Cir. 1958), it was said:

"It would seem that while the Wyoming Court has not drawn a clear distinction between the terms negligence per se and evidence of negligence, it is nonetheless committed to the doctrine that a violation of a traffic law or regulation will impose liability only when it is the proximate cause of the resulting injuries. * * * In our view, it is immaterial whether a violation of a traffic regulation constitutes negligence per se or only evidence of negligence. The decisive factor is whether such violation contributed to and

was the proximate cause of the injury suffered. * * * "

4. The instruction in *Zanetti*:

"Violation of a state traffic law is evidence of negligence. If you determine that one or more of the defendants violated such a law on the occasion in question, then you may consider that fact together with all the other facts and circumstances in evidence in determining whether or not such defendant or defendants were negligent at the time of the occurrence. In addition to this determination it must also appear from competent evidence that such violation was a proximate cause of the accident."

negligence per se by violation of a statute was not an issue. In *Kinnison v. Houghton*, 432 F.2d 1274 (10th Cir. 1970), it appears that the uncertainty that had existed in the federal establishment with regard to the same instruction later given by the United States District Judge for Wyoming had disappeared. There the court concluded:

"* * * We believe that the charge was adequate in discussing the various grounds of negligence. In so doing the Court properly left the determination to the jury whether the no-passing zone violation, considered with all the surrounding circumstances, constituted negligence that was a proximate cause of the accident."

The flavor of *Wallis v. Nauman*, 61 Wyo. 231, 157 P.2d 285 (1945), while not succinctly so stating, is that violation of a statute is evidence of negligence if, as a result, it is the cause of damage to a plaintiff. In *Blessing v. Pittman*, 70 Wyo. 416, 251 P.2d 243 (1952), this court only indicated that it had been held elsewhere that commission of an unlawful act was negligence per se.[5] We found no Wyoming case which reversed because a jury was not instructed that violation of a statute constituted negligence per se and found no Wyoming cases dealing with violation of administrative regulations as either evidence of or negligence in itself. We must arrive at the conclusion that this court simply has never met and decided the question head-on. In this case the issue is squarely presented and we must address it.

We have considered the approaches to this problem taken by other jurisdictions and have found the case law there mixed. We agree with the Alaska Supreme Court's summary of the situation:

"Other jurisdictions vary considerably in the effect given to the breach of a traffic law. The majority hold that it is negligence per se. However, a substantial minority hold that it is merely evidence of negligence, which may or may not be considered. In the latter jurisdictions it is argued that it amounts to judicial legislation for the courts to impose such potentially burdensome civil liabilities, unless the legislature has specifically permitted them to do so. It is also argued that the courts are unfair in strictly applying the doctrine and holding that no reasonable man would violate 'ill conceived, or hastily drawn or obsolete' statutes. 2 F. Harper and F. James, The Law of Torts, § 17.6 at 999 (1956)" (Footnotes omitted.) *Ferrell v. Baxter*, Alas., 484 P.2d 250, 261–262 (1971).

We also agree with the Alaska Supreme Court's conclusion as to the solution:

"* * * [M]any issues concerning the effect of a violation have remained unresolved. This in turn has created situations in which counsel for either plaintiffs or defendants, relying on a claimed confusion in the case law, have been motivated to litigate fully numerous cases which might otherwise have been settled. Accident litigation represents a large portion of the caseload of the court system.[6] Uncertainty in this area, therefore, places a needlessly heavy burden on the judicial machinery which could be relieved by any exposition which would clarify the standards and rules to be applied. The time has come to articulate a comprehensive statement in this area. This is the fairest course of action for all concerned. As Mr. Justice Holmes wrote in The Common Law 110–11 (1881):

"'Again any legal standard must, in theory, be one which would apply to all men, not specially excepted, under the

We consider it better practice to add the last sentence relating to cause, not done in the case before us, though a separate proximate cause instruction was given.

5. We should also note that the Wyoming State Bar in 1967 published a packet of civil pattern jury instructions which has been in use around the state ever since. It contains the substance of the same instruction as was given in the case

before us, except here rather than violation of a statute, violation of a rule or regulation was substituted. Experience of this court in examination of many records indicates that it is in widespread use as a matter of practice.

6. We would add that medical and other malpractice actions are accelerating in volume in the work of Wyoming courts.

same circumstances. It is not intended that the public force should fall upon an individual accidentally, or at the whim of any body of men. The standard, that is, must be fixed.'

"The rules we adopt to be applied in this state in trials held after the date of this opinion are those set forth in the Restatement (Second) of Torts §§ 286, 288A, and 288B (1965). * * *'" 484 P.2d at 263.

■ We accordingly conclude that, ·as to questions of negligence, the effect of a violation of statute, ordinance, or regulation which defines a standard of conduct will be resolved under the Restatement, Torts 2d. The pertinent sections of the Restatement, Torts 2d, include §§ 286, 287, 288, 288A, 288B, and 288C.

Section 286:

"The court *may* adopt as the standard of conduct of a reasonable man the requirements of a legislative enactment or an administrative regulation whose purpose is found to be exclusively *or in part*

"(a) to protect a class of persons which includes the one whose interest is invaded, and

"(b) to protect the particular interest which is invaded, and

"(c) to protect that interest against the kind of harm which has resulted, and

"(d) to protect that interest against the particular hazard from which the harm results." (Emphasis added.)

Section 287:

"A provision for a penalty in a legislative enactment or an administrative regulation has no effect upon liability for negli-

gence unless the penalty is found to be intended to exclude it."

Section 288:

"The court will not adopt as the standard of conduct of a reasonable man the requirements of a legislative enactment or an administrative regulation whose purpose is found to be exclusively

"(a) to protect the interests of the state or any subdivision of it as such, or

"(b) to secure to individuals the enjoyment of rights or privileges to which they are entitled only as members of the public, or

"(c) to impose upon the actor [7] the performance of a service which the state or any subdivision of it undertakes to give the public, or

"(d) to protect a class of persons other than the one whose interests are invaded, or

"(e) to· protect another interest than the one invaded, or

"(f) to protect against other harm than that which has resulted, or

"(g) to protect against any other hazards than that from which the harm has resulted."

Section 288A:

"(1) An excused violation of a legislative enactment or an administrative regulation is not negligence.

"(2) Unless the enactment or regulation is construed not to permit such excuse, its violation is excused when

"(a) the violation is reasonable because of the actor's incapacity;

"(b) he neither knows nor should know of the occasion for compliance;

7. The Restatement, Torts 2d contains and we adopt, as we did in *ABC Builders, Inc. v. Phillips,* Wyo., 632 P.2d 925 (1981), the following definitions pertinent not only to this rule but as may otherwise be used in this opinion:

"§ 3. Actor
"The word 'actor' is used throughout the Restatement of this Subject to designate either the person whose conduct is in question as subjecting him to liability toward another, or as precluding him from recovering against another whose tortious conduct is a legal cause of the actor's injury."

"§ 4. Duty
"The word 'duty' is used throughout the Restatement of this Subject to denote the fact that the actor is required to conduct himself in a particular manner at the risk that if he does not do so he becomes subject to liability to another to whom the duty is owed for any injury sustained by such other, of which that actor's conduct is a legal cause.
* * *"

"(c) he is unable after reasonable diligence or care to comply;

"(d) he is confronted by an emergency not due to his own misconduct;

"(e) compliance would involve a greater risk of harm to the actor or to others."

Section 288B:

"(1) The unexcused violation of a legislative enactment or an administrative regulation which is adopted by the court as defining the standard of conduct of a reasonable man, is negligence in itself.

"(2) The unexcused violation of an enactment or regulation which is not so adopted may be relevant evidence bearing on the issue of negligent conduct."

Section 288C:

"Compliance with a legislative enactment or administrative regulation does not prevent a finding of negligence where a reasonable man would take additional precautions."

The district court by instructing the jury in the fashion that it did, in effect applied § 288B(2) of the Restatement, supra, and did not adopt the regulations as standards of conduct, ruling that any violation of the state and federal regulations covering a hospital's emergency room was, under the facts of this case, merely evidence of negligence. We cannot hope to deal in this opinion with every problem that may arise in application of the parts of the Restatement we here approve. We will accordingly decide only one case at a time and at the moment, the one before us.

This court has held that rules and regulations adopted pursuant to statutory authority and when properly promulgated have the force and effect of law. *Yeik v. Department of Revenue and Taxation,* Wyo., 595 P.2d 965 (1979); § 9–4–101 to 9–4–106, W.S.1977. In the case before us. the rule and regulation set out in Instruction No. 18 was authorized by § 35–1–229, W.S.1977, with misdemeanor sanctions for violation, § 35–1–106, W.S.1977. We will assume that the rule and regulation set out in Instruction No. 19 having a federal

source was competent though we were not favored with any proper citation of any statute authorizing such a rule for the regulation by the federal government of a state hospital and we are not inclined to look it up for counsel for the purpose of citation in this opinion. We presume it related to the cost of care of patients paid by the federal government. In any event, appellees made no objection as to authority for the rule, nor do they cross appeal. We will decide the issue as presented. We hold that rules or regulations having the force and effect of law will be treated as contemplated by the parts of the Restatement we adopt in considering whether they should be embraced as standards of conduct in tort actions.

We observe first that with respect to rules and regulations, authors of the Restatement discovered:

"More frequently than in the case of statutes or ordinances, the requirements of administrative regulations are not adopted by the court as defining a definite standard of conduct in negligence actions, but are accepted as affording relevant evidence. The courts have tended to look, more often than in the case of a statute, to the nature of the regulation, the circumstances of the case, and particularly to the character and importance of the administrative body which has issued the regulation. Thus a rule of the Interstate Commerce Commission may be adopted as defining a definite standard, a departure from which is negligence in itself, where an order of a city fire department commission would at most be accepted as relevant evidence." Restatement, Comments on Subsection (2) of section 288B, supra.

We add to that the judicial discretion which is vested by § 286, supra, by its use of the words "*may* adopt as the standard of conduct * * * an administrative regulation * * *," (emphasis added) explained in comment "d" to the latter section:

"d. *Where no provision for civil liability.* The enactment or regulation may, however, provide only for criminal liability, and not for civil liability; or in rare in-

stances it may merely prohibit certain conduct, and contain no provision for any liability at all. In such cases the initial question is whether the legislation or regulation is to be given any effect in a civil suit. Since the legislation has not so provided, the court is under no compulsion to accept it as defining any standard of conduct for purposes of a tort action.

* * * * * *

" * * * The decision to adopt the standard is purely a judicial one, for the court to make. When the court does adopt the legislative standard, it is acting to further the general purpose which it finds in the legislation, and not because it is in any way required to do so.

"On the same basis, the court may adopt the standard of conduct laid down by an administrative regulation. The courts have tended to adopt administrative standards less frequently than those of legislative enactments.

" * * * * "

While Alaska has adopted the same Restatement rule, it also acknowledges that application of negligence per se is not always appropriate. *McLinn v. Kodiak Electric Association, Inc.*, Alas., 546 P.2d 1305 (1976).

In the particular situation now before us, there is not only no statutory requirement that there be civil liability for violation of the regulations, but the Wyoming legislature has enacted protective legislation by § 35–2–115, W.S.1977, pertaining to the licensing and operation of hospitals:

"(a) Emergency service and care shall be provided, at the regularly established charges of the hospital, *to any person requesting such services or care*, or for whom such services or care is requested, for any condition in which the person is in danger of loss of life, or serious injury or illness, at any hospital licensed in the state of Wyoming that maintains and operates emergency services to the public when such hospital has appropriate facilities and qualified personnel available to provide such services or care.

"(b) Neither the hospital, its employees, nor any physician licensed to practice in the state of Wyoming shall be held liable in any action arising out of a refusal to render emergency services or care at such licensed hospital, *if ordinary medical care and skill is exercised in determining the condition of the person,* and a decision is made that such refusal shall not result in any permanent illness or injury to such person or a decision is made that sufficient qualified personnel are not available to treat said person, or a decision is made that facilities or equipment are not available to treat said person or in determining the appropriateness of the facilities, the qualifications and availability of personnel to render such services." (Emphasis added.)

The clarity and mandatory nature of the state regulations as standards came into question through the testimony of Dr. Cohen, Administrator of the Division of Health and Medical Services, State of Wyoming, who had been responsible for their codification and publication. During his questioning, the following exchange took place:

"Q. I direct your attention particularly to Section 13 thereof on page 6A and subheading C 3.

"A. Yes, sir.

"Q. And ask you to read that?

"A. A physician shall see all patients who arrive for treatment in the emergency service.

"Q. First let me ask you if during the time that you have been the Director if you have ever had a complaint lodged against the Natrona County Memorial Hospital with respect to that section that you just read?

"A. Not to my knowledge.

"Q. Now as a medical practitioner do you hold an opinion as to what that section means with respect to medical practice?

"A. Yes, I have an opinion.

"Q. Would you state your opinion?

"A. My opinion is that this can and should be interpreted and is in my opinion

interpreted as a physician passing judgment on a particular case and didn't, in my opinion, necessarily mean that he had to lay eyes on the patient. I feel that the opinion, in my opinion, that the physician accepts responsibility for the case when he is called on and then it is purely judgmental as to his disposition of the case.

"Q. How long have you held that opinion, Doctor?

"A. Forever.

"Q. Do you hold that opinion now?

"A. Yes, sir."

Dr. Cohen further testified that as pointed out in the preface to the regulations:

" * * * The standards, rules and regulations found in this book represent several years of study by many interested parties, and hopefully will result in an upgrading of the facilities through an educational approach rather than mandatory regulations."

A somewhat similar situation arose in *Castillo v. United States*, 552 F.2d 1385 (10th Cir. 1977) where appellant claimed that certain Veterans Administration Regulations should have been given as negligence per se standards rather than evidence of negligence. A Veterans Administration psychiatrist testified during the trial that the regulations in question were inconsistent with modern psychiatric treatment and were not generally followed to the letter. Weight was given to that testimony by the federal court to justify the trial court's decision that at most violation of the regulations was only evidence of negligence.

Section 288(d) of the Restatement authorizes the nonadoption of the legislatively defined standard of conduct in those circumstances where the legislative enactment was intended to protect a class of persons other than the one whose interests were invaded. Therefore, we must consider the intent of those regulations which were read to the jury in Instruction Nos. 18 and 19, supra, which appear identical. In particu-

lar, we shall focus on the language that "[a] physician shall see all patients who arrive for treatment in the emergency service." Clearly the class of persons intended to be protected is those in need of emergency treatment.

There was a question as to whether Ms. Poulin became a patient by entering the emergency room. There was a further evidentiary question as to whether she was a person in need of emergency treatment. If the evidence was clear that she became a patient in need of emergency treatment, then an instruction adopting the regulation as a standard of conduct might have been, to at least that extent, more clearly indicated; but, of course, that is not the only consideration.

Even if we were to accept that Ms. Poulin was in need of emergency treatment, we do not believe that the district court erred in refusing to instruct the jury that violation of the regulations constituted negligence per se. The regulation involved here is overbroad and inflexible. What constitutes an emergency can be very subjective.[8] Here there was evidence that Ms. Poulin walked into an emergency room merely looking for a doctor with whom she could make an appointment and denied the existence of any symptoms of an emergency. In such a case it is reasonable to assume she will not be accorded the same attention given an individual who clearly has been critically injured or obviously in a state that calls for immediate action, as for example someone battered, bleeding and unconscious or potentially manifesting the symptoms of a heart attack or complaining of physical distress. There is no clear evidence of pressing need, though there was evidence that Ms. Poulin was in the hospital because she knew she was overweight, that she wanted help, and that she conveyed this information to the hospital staff by way of inquiring for an appointment with some physician, not immediate attention.

**8.** This court in *City of Rock Springs v. Police Protection Association*, Wyo., 610 P.2d 975, 981 (1980) had occasion to approve Webster's definition of "emergency" as, "an unforeseen com-

bination of circumstances or the resulting state that calls for immediate action" and "a pressing need."

When the facts represent a conglomeration of circumstances such as here in order to reach application of the statutory or regulatory violation, use of the negligence per se doctrine is not desirable. As said in *Eisenhuth v. Moneyhon*, 161 Ohio St. 367, 119 N.E.2d 440 (1954):

"In other words, if a positive and definite standard of care has been established by legislative enactment [administrative regulation] whereby a jury may determine whether there has been a violation thereof by finding a single issue of fact, a violation is negligence per se; but where the jury must determine the negligence or lack of negligence of a party charged with the violation of a rule of conduct fixed by legislative enactment from a consideration and evaluation of multiple facts and circumstances by the process of applying, as the standard of care, the conduct of a reasonably prudent person, negligence per se is not involved." (Bracketed words added.)

The jury in the case before us was instructed to describe properly pertinent facts:

"A physician is responsible for exercising due care toward his patients. This responsibility includes the determination of whether or not specific diagnostic procedures or treatment is warranted by the condition as presented to such physician: If you find from the evidence that Plaintiff decedent's condition was presented to Defendant, or should have been presented to Defendant had he exercised reasonable care, either through direct physical examination, or through reports of diagnostic procedures, or through medical history, or a combination of any of these, and if you also find from the evidence that Plaintiff decedent's condition as presented to Defendant would be recognized by an ordinarily skillful physician of the same school as Defendant during the same period while exercising due care as immediately or within a limited period of time requiring either further diagnostic procedures or treatment or both, and if you also find from the evidence that Defendant did not commence such diagnostic procedures or treatment within the time required by such standard of care, then you are instructed to find Defendant liable for any damages to Plaintiff which were proximately caused by such delay of diagnostic procedure and/or treatment. You are also instructed that if Defendant is found liable for damages due to any delay in diagnosis or treatment or both, such liability would exist even if Defendant is not responsible for the original medical condition."

That was, and correctly so, the ultimate issue in the case.[9] We cannot disagree with the trial judge's handling of the matter of the state and federal regulations.

## IV

Appellant asserts that the evidence is uncontradicted that there were violations of the administrative rules and regulations and therefore negligence as a matter of law was present. Thus, it was error for the jury to return a verdict of no negligence[10]. This is not an accurate statement.

9. Appellant made no objection to this instruction.

10. A special form of verdict was used and returned.
"We, the jury, duly empaneled, do find as follows: (Please mark the appropriate answers)

"1. Do you find from the evidence that Dr. Frederick Cubin was negligent?

"A. Yes _____ No X

"2. Was such negligence, if any, of Dr. Frederick Cubin a proximate cause of the death of Mary Poulin?

"A. Yes _____ No X

"3. Do you find from the evidence that Natrona County Memorial Hospital was negligent?

"A. Yes _____ No X

"4. Was such negligence, if any, of the hospital, a proximate cause of the death of Mary Poulin?

"A. Yes _____ No X

* * * * *"

Completion of the verdict form as to the non-presence of negligence should have ended the jury's deliberations, and thus matters of causal connection and damages were immaterial. (The step instruction would have been a better

It presumes that the court was in error in not instructing the jury that violation of the regulation was negligence in itself. It also ignores the fact that, assuming violation was negligence in itself, the appellant still had the burden of proving that the decedent came to the hospital seeking emergency treatment as a patient and that an emergency existed. The evidence was conflicting in that regard. We will not substitute our judgment on the facts for the jury's in the presence of substantial evidence. On appeal we assume the evidence in favor of the successful party is true and leave out of consideration entirely the evidence presented by the unsuccessful party in conflict therewith, and we give the evidence of the successful party every reasonable inference that may be reasonably drawn from it. *Brittain v. Booth*, Wyo., 601 P.2d 532 (1979). Here, the testimony of witnesses bears out the fact that there was no emergency. Ms. Poulin walked into the hospital and the friend who brought her did not think it important that Ms. Poulin see a doctor that day. The nurses who talked to her saw no signs of distress and she only said she could not lose weight; there was no evidence of swelling in her legs. She was asked several times if there was anything else wrong other than not being able to lose weight, to which she always answered in the negative. The nurses on duty called Dr. Cubin with this scant information—all that could be gleaned from Ms. Poulin. With only information that she was overweight, Dr. Cubin arranged an appointment with her at 9:00 a. m. the next morning. Ms. Poulin was satisfied with that, smiled and got out of her chair, unassisted, and left. Dr. Cubin was repeatedly assured that she had no other complaints. The statement by Ms. Poulin's sister was that after Ms. Poulin left the hospital she ate a dinner of spaghetti and chicken. There is also evidence that even just before coming to the hospital, she had eaten a hot dog.

 It must be realized that the burden of proof for a plaintiff relying on a duty derived from a statute or regulation is the same and is subject to the effect of defenses as in any other case. No special dispensation in that regard is given plaintiffs relying on negligence in itself. Appellant was simply unable to satisfy the jury he had a case of negligence. Though not an issue in this case, it cannot be over-emphasized that not only must a plaintiff prove a violation, but must also prove by a preponderance of the evidence it was a direct (proximate) cause of the injury (death in this case) claimed, also a jury question.

## V

Appellant's last challenge to the jury's verdict is premised upon juror misconduct. It arises from contact between a juror—Robert Asadi—and a pathologist—Dr. James Thorpen—who had been listed as a witness to be called by appellant as well as the appellees in pretrial memoranda. Additionally, we note in the record that during voir dire, each juror was asked about his or her acquaintanceship with witnesses who would be called. Juror Asadi was questioned by appellant's counsel as to his acquaintanceship with Dr. Thorpen in the following colloquy:

"Does anyone know Dr. James Thorpen?

"JUROR ASADI: I know him very well, I coach the boys and know the family real well.

"MR. MEYER: You have good justifiable feelings of friendship toward Dr. Thorpen?

"JUROR ASADI: Yes.

"MR. MEYER: And have you seen him as a physician?

"JUROR ASADI: No.

"MR. MEYER: Do you feel even though you have this relationship that you could assure, that you would give his testimony no greater weight than the testimony of any similar witness having the same qualifications?

form if there had been a break between negligence and causal connection because, since no

negligence was present, there was no need to consider cause.)

"JUROR ASADI: Well, I don't know, I respect his judgment, I haven't seen him practice, but I have heard him talk about, at least, I think he is a very dedicated doctor, and I respect his fairness and things like that. I consider him highly competent.

"MR. MEYER: Okay. In his field, and what is his field, do you know?

"JUROR ASADI: He is a pathologist.

"MR. MEYER: He is a doctor, I take it, that does autopsies and things like that. In spite of his knowledge, Mr. Asadi, if you are chosen to be on this jury, would you be able to fairly and justly give his testimony the same weight as you would give a witness that you didn't know?

"JUROR ASADI: If I thought in my mind, I thought he was a competent witness, yes.

"MR. MEYER: Okay, thank you."

The relevant portion of the juror's affidavit concerning the incident is as follows:

"3. During the course of the trial on one occasion, the 14th day of June, 1980 which was a Saturday, I drove by the residence of Jim Thorpen, M.D. and observed Jim working on some sprinkler or pipe in his front yard. I stopped and made a remark such as 'how did you get off so lucky not being called as a witness?'. He replied that he didn't know but that he had an opinion about it and that we might talk after the case was finally completed. That is the complete conversation about any subject matter connected with the Poulin case.

"4. Following this conversation I stayed there at the Thorpen residence for a short period of time and helped work on the sprinkler. The sprinkler was not getting any water through the sprinkler head and there was a possible break or leak in the pipe somewhere and we discussed the methods of doing that but were unable to solve the problem that day.

"5. It so happens that since the trial I have not had any discussion with Dr. Thorpen about the facts or any situations existing with respect to the Poulin case."

Dr. Thorpen's version of the incident is almost identical. In his affidavit he stated:

"6. I have known Mr. Robert Asadi for several years. That my family consists of several boys and that my oldest boy James C. Thorpen age 16, is a baseball player and had played on a team in the Babe Ruth League which was coached by Robert Asadi. My son and Mr. Asadi have become good friends over a period of time. Mr. Asadi has stayed at our residence on occasion as a sitter for our children when my wife and I have been absent from the house. The last time that Mr. Asadi performed this function at our household was between the dates of June 24 and July 1, 1980, which was a period of time when my wife and I and the other children, with the exception of James C., were in Sun Valley, Idaho.

"7. I have never discussed any of the elements nor remarked about any opinions I held of the Poulin case with Mr. Asadi at any time before the trial nor at any time during the period of time that the trial was in progress. At some point in time during the trial Mr. Asadi came by our residence on South Poplar looking for Jim. He was in his pickup truck and I was working on a irrigation pipe in our yard and Mr. Asadi jokingly remarked to me 'how were you so lucky as to not be called as a witness' to which I merely replied 'I don't know'. I recall that I said that I couldn't talk about it because I was a listed witness but I would like to talk after the trial is over. This has never occurred as of this date. After my response with respect to his inquiry about being a witness Mr. Asadi made no further comment to me with respect to the case in progress nor did we have any further discussion about the case. I have never spoken to Asadi as indicated about any of the facts nor any opinions which I may have held or do hold about this matter and Mr. Asadi has never received any information from me with respect to the merits of this case or the cause of death of Mary Poulin nor has he ever indicated to me any of his opinions regarding the same."

Appellant contends that the contact between the juror and Dr. Thorpen was of special importance.

"The discussion with defense witness, Dr. Thorpen, was particularly important since during plaintiff's closing argument plaintiff argued that Dr. Thorpen had not been called inferring that his testimony would be unfavorable to defendants (2135). Juror Asadi had improperly discovered otherwise. He knew that Thorpen had strong opinions which were favorable to the defendants. * * *

\* \* \* \* \* \*

"Since Asadi knew that Thorpen's testimony would be favorable to defendant he could disregard the inference created by plaintiff's argument that Thorpen wasn't called since his testimony would be harmful to defendants. This taking of extrajudicial information or testimony by Asadi clearly prejudiced the plaintiff and it was error for the trial court to refuse to grant a new trial because of it. It is important that our system of justice in Wyoming not be infected by these types of contacts. We simply must not give such contacts a stamp of approval, because they create a clear danger to the integrity of our jury system."

There is nothing in the record to support the appellant's naked assertion that the juror had discovered or been influenced by anything from the conversation with Dr. Thorpen.

 The law is well settled that it is improper for a juror to have any out-of-court communications concerning a case with a witness in the case. Jurors cannot make any attempts to obtain additional evidence. See Annotation: "Prejudicial effect, in civil case, of communications between witnesses and jurors," 52 A.L.R.2d 182 and Later Case Service. Of course, in many instances it is difficult for jurors to know before a person testifies that the person is to be called as a witness. But putting that consideration aside, the rule is:

"Where there has been misconduct on the part of a juror, the grant or denial of a motion for a mistrial is a matter within the sound discretion of the trial court. *Sanders v. Beckwith*, 79 Ariz. 67, 70, 283 P.2d 235, 238 (1955). Prejudice to the moving party will not be assumed; it must appear probable from the record. *Webb v. Hardin*, 53 Ariz. 310, 89 P.2d 30 (1939). \* \* \* \* " *Ulan v. Richtars*, 8 Ariz. App. 351, 446 P.2d 255, 258 (1968).

As said by another court:

"The significant and controlling thing is not that the juror violated the instructions of the court and was guilty of an impropriety but, rather, whether the conversations were 'of such a nature that their effect must fairly be held to have been to deprive the injured party of a fair and impartial trial.' *Rent-A-Car Co. v. Globe & Rutgers Fire Ins. Co.*, 163 Md. 401, 408, 163 A. 702, 705, 86 A.L.R. 922. The rule followed in that case was that 'not every trivial act on the part of the juror * * * amounts to such misconduct as requires the withdrawal of a juror' and the Court held: 'The better rule in such cases would seem to be that such questions be left to the sound discretion of the trial court, whose decision should only be disturbed in those cases where there has been a plain abuse of discretion, resulting in palpable injustice.' The case is annotated in 86 A.L.R. 922 with subsequent annotations in 52 A.L.R.2d 182, 62 A.L.R.2d 298, and 64 A.L.R.2d 158. The cases elsewhere are generally in accord, as was noted by Judge Henderson for the Court in *Joseph F. Hughes & Co. v. Stockhausen*, 212 Md. 559, 129 A.2d 844, which followed *Rent-A-Car Co.* in finding no abuse of discretion in the refusal to declare a mistrial because of a juror's conversation about the case." *Safeway Trails, Inc. v. Smith*, 222 Md. 206, 159 A.2d 823, 829–830 (1960).

 Thus, we hold that "[a] mere showing of conduct or communication between a juror and a witness is not sufficient to mandate a mistrial. Prejudice must be shown." *Department of Transportation v. Drobnick*, 54 Ill.App.3d 987, 12 Ill.Dec. 619, 623, 370 N.E.2d 242, 246 (1977). Further, we will defer to the district court's determi-

nation as to whether prejudice occurred unless there is no rational basis for its finding.

■ In this case, we cannot find any reason to disagree with the trial court's determination that no prejudice occurred. Both participants to the out-of-court conversation agreed that nothing of any import was said. We have no reason to doubt them.

Affirmed.