2005 WY 82

**Richard BURNETT, Appellant (Plaintiff),**

v.

**IMERYS MARBLE, INC., a Delaware corporation, Appellee (Defendant).**

No. 04–182.

Supreme Court of Wyoming.

July 27, 2005.

Representing Appellant: John Edward Hansen of Scalley & Reading, P.C., and Karra J. Porter of Christensen & Jensen, P.C., Salt Lake City, Utah. Argument by Ms. Porter.

Representing Appellee: Richard A. Mincer of Hirst & Applegate, P.C., Cheyenne, Wyoming.

Before HILL, C.J., and GOLDEN, KITE, VOIGT, and BURKE, JJ.

GOLDEN, Justice.

[¶ 1] Richard Burnett, an employee of Thurel Mason Trucking, was injured when he fell off his flat bed truck as he was placing tarps over a load of marble he had picked up at a facility owned by Imerys Marble, Inc. Burnett sued Imerys for negligence asserting Imerys had breached its duty of care to Burnett by, among other things, failing to comply with Mine Safety and Health Administration (MSHA) regulations. The district court determined Imerys owed no duty of care to Burnett and granted Imerys' motion

for summary judgment. Burnett now appeals.

[¶ 2] We affirm.

## ISSUES

[¶ 3] Burnett presents one issue for review: "Did the trial court incorrectly rule that 30 C.F.R. § 56.15005 did not create a duty on the part of defendant Imerys to provide fall protection for Richard Burnett?" Imerys rephrases the issue slightly but agrees this is the only issue on appeal.

## FACTS

[¶ 4] Imerys owns a calcium carbonate mine near Wheatland, Wyoming. Imerys' facilities include a mine where the material is extracted, a plant where the material is processed, and a warehouse where the material is loaded onto trucks for transport. The warehouse is near the processing facility. However, the actual mine site is located approximately seventeen miles from the processing and warehouse facilities.

[¶ 5] Product stored in the warehouse is routinely loaded onto commercial trucks for delivery to Imerys' customers. Imerys and the commercial trucking companies that deliver its products have an independent contractor relationship. Imerys requires that all loads of its product leaving its warehouse either be in an enclosed van or "tarped." "Tarping" generally requires the use of two tarps, laid out from atop the load and then fastened to the side of the trailer with tie-downs. Imerys does not provide an area specifically for tarping but does specify where it does not want truckers tarping their load, which is generally the processing area. Imerys likewise does not provide any fall protection for the tarping process. However, "tarping" a load is not unique for product loaded at Imerys, and a typical tarping procedure does not include the use of fall protection. For instance, Burnett, as an employee of Thurel Mason Trucking, tarps approximately ninety percent of the loads that he hauls, most of which have no connection to Imerys. The tarps themselves are provided by Thurel Mason Trucking, and Thurel Mason Trucking pays its drivers an additional

ten dollars each time they are required to tarp a load. Burnett was trained how to tarp his load by Thurel Mason Trucking, and no one at Imerys instructed Burnett on how to tarp his load.

[¶ 6] On July 2, 2001, Burnett arrived at Imerys' warehouse to pick up a load of Imerys' product. After Imerys personnel loaded Burnett's flat bed truck to his satisfaction, he asked them if they could place the tarps on top of the load with the forklift because each tarp weighed about one hundred pounds. Imerys personnel did so. Burnett then drove his truck to an open area across the road from Imerys' warehouse and began tarping his load. Burnett climbed to the top of the load to roll out the tarps. As he was finishing with the second tarp, Burnett lost his footing and fell off the top of the load, hitting the trailer and landing on the ground. Burnett fell about seven and one half feet and suffered severe injuries, including broken ribs and a broken hip.

[¶ 7] Following Burnett's accident, MSHA investigated the incident. MSHA cited Imerys for a violation of 30 C.F.R. § 56.15005 (2004), which states:

> Safety belts and lines shall be worn when persons work where there is danger of falling; a second person shall tend the lifeline when bins, tanks, or other dangerous areas are entered.

Rather than contest the citation, Imerys decided to implement a system of fall protection, and the citation was terminated. Imerys nevertheless maintains that this MSHA regulation does not apply in this instance.

[¶ 8] On May 31, 2002, Burnett filed suit against Imerys asserting, among other things, that Imerys was negligent because it breached its duty of care by failing to comply with MSHA regulations. Imerys filed a motion for summary judgment claiming that the MSHA regulations do not create a legal duty to provide fall protection to truck drivers who are tarping loads on their own trucks as an ordinary and common part of the truck driving business. Specifically, Imerys argues that the regulations do not apply to non-miners not exposed to mine hazards. Additionally, citing *Jones v. Chevron*, 718

P.2d 890 (Wyo.1986), Imerys claims that even if the regulations applied, under Wyoming law an owner is not obligated to protect the employees of an independent contractor from hazards which are incidental to, or part of, the very work the contractor was hired to perform.

[¶ 9] The district court granted Imerys' motion for summary judgment finding that the MSHA regulation did not apply because Burnett was not at a mine and was not a miner as defined by MSHA. The district court noted Burnett had parked his truck in a vacant field away from Imerys' warehouse and processing facility and was miles from where the marble was mined. Therefore, the hazard he faced was not related to mining but instead trucking. Accordingly, the district court concluded that Imerys owed no duty of care to Burnett. Burnett now appeals.

### STANDARD OF REVIEW

[¶ 10] We have noted many times:

When we review the granting of a summary judgment, we employ the same standards and use the same materials as were employed and used by the trial court. We examine the record from the vantage point most favorable to the party who opposed the motion, and we give that party the benefit of all favorable inferences that may fairly be drawn from the record. Summary judgment is appropriate only when no genuine issue as to any material fact exists and the prevailing party is entitled to have a judgment as a matter of law. A genuine issue of material fact exists when a disputed fact, if it were proven, would have the effect of establishing or refuting an essential element of the cause of action or defense which the parties have asserted. We review a grant of summary judgment deciding a question of law de novo and afford no deference to the trial court's ruling.

*Act I, LLC v. Davis,* 2002 WY 183, ¶ 9, 60 P.3d 145, ¶ 9 (Wyo.2002) (citing *Bevan v. Fix,* 2002 WY 43, ¶ 13, 42 P.3d 1013, ¶ 13 (Wyo. 2002); *Hirschfield v. Bd. of Cty. Comm' rs of Teton Cty.,* 944 P.2d 1139, 1141 (Wyo.1997)). Whether a regulation imposes a duty of care is a question of law. *Distad v. Cubin,* 633 P.2d 167, 171 (Wyo.1981).

### DISCUSSION

[¶ 11] As noted in the fact section, Imerys was cited by MSHA personnel following Burnett's accident for failure to comply with the MSHA regulation. The correctness of that decision is not the issue before us. Instead, the only issue presented by this appeal is whether 30 C.F.R. § 56.15005 imposes a duty of care on Imerys for Burnett's benefit under Wyoming law. We have indicated that questions regarding whether a statute or regulation defines a duty of care will be resolved under the Restatement (Second) of Torts. *Distad,* 633 P.2d at 175. In *Distad,* we specifically cited the Restatement (Second) of Torts § 286, which provides:

The court may adopt as the standard of conduct of a reasonable man the requirements of a legislative enactment or an administrative regulation whose purpose is found to be exclusively or in part

(a) to protect a class of persons which includes the one whose interest is invaded, and

(b) to protect the particular interest which is invaded, and

(c) to protect that interest against the kind of harm which has resulted, and

(d) to protect that interest against the particular hazard from which the harm results.

*Distad,* at 175. A court will not adopt an administrative regulation as the standard of care if its purpose is to protect a class of persons other than the one whose interests are invaded. *Id.* (citing Restatement (Second) of Torts § 288). Accordingly, in deciding whether the MSHA regulation creates a duty in this instance we must look to the purpose of the regulation in question.

[¶ 12] The MSHA regulations were created pursuant to the Federal Mine Safety and Health Act of 1977 (Mine Act). Therefore, to determine whether the MSHA regulation creates a duty of care under these facts, it is necessary to consider the purpose and scope of the Mine Act itself. When adopting the Mine Act, "Congress was plainly aware that

the mining industry is among the most hazardous in the country" and designed the Act to improve the health and safety at the Nation's mines. *Herman v. Associated Elec. Co-op., Inc.,* 172 F.3d 1078, 1081 (8th Cir. 1999). Congress expressly declared the purpose of this Act as follows:

§ 801. **Congressional findings and declaration of purpose**

Congress declares that—

(a) the first priority and concern of all **in the coal or other mining industry** must be the health and safety of its most precious resource—the **miner;**

(b) deaths and serious injuries from unsafe and unhealthful conditions and practices **in the coal or other mines** cause grief and suffering to **the miners** and to their families;

(c) there is an urgent need to provide more effective means and measures for improving the working conditions and practices **in the Nation' s coal or other mines** in order to prevent death and serious physical harm, and in order to prevent occupational diseases **originating in such mines;**

* * * *

(g) it is the purpose of this chapter (1) to establish interim mandatory health and safety standards and to direct the Secretary of Health and Human Services and the Secretary of Labor to develop and promulgate improved mandatory health or safety standards to protect the health and safety of the **Nation' s coal or other miners;** (2) to require that each operator **of a coal or other mine and every miner in such mine** comply with such standards; (3) to cooperate with, and provide assistance to, the States in the development and enforcement of effective State **coal or other mine** health and safety programs; and (4) to improve and expand, in cooperation with the States and **the coal or other mining industry,** research and development and training programs aimed at **preventing coal or other mine accidents** and occupationally caused diseases in the industry.

30 U.S.C. § 801 (2000) (emphasis added). As can be seen by the plain language of § 801, the purpose of the Mine Act is to protect **miners** working in **mines.**

[¶ 13] Both "miner" and "mine" are defined in 30 U.S.C. § 802 (2000), which provides:

(g) "miner" means any individual working in a coal or other mine;

(h)(1) "coal or other mine" means (A) an area of land from which minerals are extracted in nonliquid form or, if in liquid form, are extracted with workers underground, (B) private ways and roads appurtenant to such area, and (C) lands, excavations, underground passageways, shafts, slopes, tunnels and workings, structures, facilities, equipment, machines, tools, or other property including impoundments, retention dams, and tailings ponds, on the surface or underground, used in, or to be used in, or resulting from, the work of extracting such minerals from their natural deposits in nonliquid form, or if in liquid form, with workers underground, or used in, or to be used in, the milling of such minerals, or the work of preparing coal or other minerals, and includes custom coal preparation facilities. In making a determination of what constitutes mineral milling for purposes of this chapter, the Secretary shall give due consideration to the convenience of administration resulting from the delegation to one Assistant Secretary of all authority with respect to the health and safety of miners employed at one physical establishment[.]

[¶ 14] Considering these two sections and the facts of these circumstances, we must conclude that Burnett is not among the class of persons the Mine Act is intended to protect. First, Burnett is not a miner because he is not an individual working in a mine. While the definition of "mine" is broad enough to include milling facilities such as Imerys' processing facility, it is clear that Burnett does not work in that facility and is not allowed in that facility when tarping his load. Burnett does get his truck loaded at the warehouse but no processing takes place at the warehouse. Furthermore, Burnett was not even at the warehouse when the accident occurred. Instead, he was in an

open field across from the warehouse. Burnett is not a miner. He is a commercial truck driver who occasionally transports products produced in a mine.

[¶ 15] Second, it is clear that the purpose of the Mine Act is to protect against the hazards associated with mining. As the district court recognized, the hazard that Burnett encountered was not a mining hazard but a hazard of his job as a commercial trucker. Indeed, Burnett acknowledged that tarping was a normal part of his job as a trucker. He tarped approximately ninety percent of his loads, many of which are in no way related to Imerys or other mining operations. Thus, Burnett's accident was not a product of the hazard the Mine Act was intended to protect against. Accordingly, we must conclude that the requirements of Restatement (Second) of Torts § 286 are not met.

[¶ 16] Burnett argues that even though the Mine Act references the terms "mines" and "miners," the actual regulation at issue, 30 C.F.R. § 56.15005, uses the terms "person" and "where there is a danger of falling." Therefore, he asserts that § 56.15005 was intended to protect a broader class of persons in broader circumstances. We agree that the language of § 56.15005 does not use the terms "mine" and "miner" like the Mine Act itself. Nevertheless, the regulations must still be considered in the context of the Mine Act under which they are promulgated. Absent such a limitation, the words in the MSHA regulations could conceivably extend to unfathomable lengths. *Herman*, 172 F.3d at 1081–82. *See also Bush & Burchett, Inc. v. Reich*, 117 F.3d 932, 936–37 (6th Cir.1997). Although Congress intended the Mine Act to be given broad interpretation to achieve its goals, its coverage is not without limit. *Herman*, 172 F.3d at 1081–82. When considering the regulations associated with the Mine Act to determine if they impose a duty under Wyoming law we must keep the intent and purpose of that Act in mind. When doing so, it is clear that every person whose business simply brings him into contact with minerals does not fall within the coverage of the MSHA regulation. *Id.* at 1082.

[¶ 17] In that respect, while § 56.15005 extends to "persons" where there is a danger of falling, the regulation is still clearly limited to the operations of a mine. Indeed, 30 C.F.R. 56.1 (2004) states, "This part 56 sets forth mandatory safety and health standards for each surface metal or nonmetal mine, including open pit mines, subject to the Federal Mine Safety and Health Act of 1977." Once again, the regulations themselves make it clear that their application extends to operations at a mine. As discussed above, no mining operations take place where Burnett's accident occurred.

[¶ 18] Additionally, we consider the reasoning of other courts considering MSHA regulations. Although not completely analogous because the entity cited for a violation of the MSHA regulations was not the mine but an entity doing business with the mine, similar reasoning can be found in *Old Dominion Power Co. v. Donovan*, 772 F.2d 92 (4th Cir.1985). In *Old Dominion* the court was asked to determine whether the provider of electricity doing work at a substation owned and built by the coal company where the electricity provider merely reads the meters is an "operator" under the Mine Act. The court found that the electricity provider was not an "operator" and noted, "[p]etitioner's employees rarely go upon mine property and hardly, if ever, come into contact with the hazards of mining. They perform no activities or functions on mine property that they do not perform elsewhere." *Id.* at 96. The court also noted that the portion of the MSHA regulations that extends to independent contractors was intended to permit enforcement of the Act against independent contractors that have a continuing presence at the mine. *Id. See also Northern Ill. Steel Supply Co. v. Secretary of Labor*, 294 F.3d 844, 848 (7th Cir.2002) (Considering the definition of "operator" and noting that there may be a point at which an entity's contacts with a mine would be so attenuated or so infrequent that it would be difficult to conclude that services were being performed under the Mine Act.).

[¶ 19] Burnett's contacts with Imerys as an employee of Thurel Mason Trucking are similarly attenuated. Burnett does not per-

form any activities at Imerys that he does not perform elsewhere and has no continuing presence at Imerys' mine. Consequently, we too find it difficult to conclude that Burnett's services were being performed under the regulations of the Mine Act. Therefore, because we find that the requirements of the Restatement (Second) of Torts § 286 are not met, we conclude that in these circumstances the regulation does not impose a duty on Imerys for Burnett's benefit. We hold that the district court was correct to grant summary judgment.

## CONCLUSION

[¶ 20] For the reasons discussed above we find that in this instance the MSHA regulations do not impose a duty of care of Imerys. Burnett cannot maintain his negligence action. We affirm the district court's grant of Imerys' motion for summary judgment.